**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF MICHIGAN,<br>*Petitioner*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF ENERGY<br>and CHRIS WRIGHT, Secretary,<br>UNITED STATES DEPARTMENT OF ENERGY,<br>*Respondents*. | ) | DOE Order No. 202-26-39 |

**PETITION FOR REVIEW**

Pursuant to Rule 15 of the Federal Rules of Appellate Procedure, Circuit Rule 15, and section 313 (b) of the Federal Power Act, 16 U.S.C. § 825*l*(b), Michigan Attorney General Dana Nessel, on behalf of the People of the State of Michigan, hereby petitions the Court for review of Order No. 202-26-39 of Respondents, the United States Department of Energy, and Chris Wright, Secretary, United States Department of Energy, issued on August 14, 2026 ("the Campbell VI Order," attached as Exhibit A). The Department of Energy issued Order No. 202-26-39 pursuant to section 202(c) of the Federal Power Act, 16 U.S.C. § 824a(c), a provision initially vested in the Federal Power Commission that was assigned to the Department through the Department of Energy Organization Act, 42 U.S.C. § 7151(b). As an order issued under the Federal Power Act, Order No. 202-26-39 is subject to the rehearing and judicial review provisions of 16 U.S.C. § 825*l*. *See* 42 U.S.C. § 7192(a) ("Judicial review of agency action taken under any law the functions of which are vested by law in, or transferred or delegated to the Secretary [of Energy] . . . shall, notwithstanding such vesting, transfer, or delegation, be made in the manner specified in or for such law.").

On behalf of the People of the State of Michigan, on September 11, 2026, the Michigan Attorney General participated in the proceedings before the Department of Energy and timely filed a request for rehearing of Order No. 202-26-39 (Exhibit B). That rehearing request may be deemed denied by operation of law because the Department did not act upon it within 30 days. *See* 16 U.S.C. § 825*l*(a); *Allegheny Def. Project v. FERC*, 964 F.3d 1, 18-19 (D.C. Cir. 2020). Therefore, the Michigan Attorney General may file this petition for review under 16 U.S.C. § 825*l*(b). This petition is timely filed within sixty days of the denial of rehearing. 16 U.S.C. § 825*l*(b). The People of the State of Michigan are a party aggrieved by the Campbell VI Order, this Court has jurisdiction, and venue in this Court is proper under 16 U.S.C. § 825*l*(b). Petitioner respectfully requests that this Court hold unlawful, vacate, and set aside the Order, and grant such further relief as may be deemed just and proper.

Dated: October 14, 2026

Respectfully submitted,

Dana Nessel,
Michigan Attorney General

/s/ Michael Moody

Michael E. Moody (P51985)
Lucas Wollenzien (P86928)
Assistant Attorneys General
Special Litigation Division
P.O. Box 30755
Lansing, MI 48909
517-335-7627
MoodyM2@michigan.gov
WollenzienL@michigan.gov

Christopher M. Bzdok (P53094)
Special Assistant Attorney General
chris@tropospherelegal.com

# Exhibit A

**Department of Energy**
Washington, DC 20585

Consumers Energy Company and
Midcontinent Independent System Operator, Inc.
Regarding J.H. Campbell Generating Plant

Order No. 202-26-39

Pursuant to the authority vested in the Secretary of Energy (Secretary) by section 202(c) of the Federal Power Act (FPA),[1] and section 301(b) of the Department of Energy (DOE or the Department) Organization Act,[2] and for the reasons set forth below, I hereby determine that an emergency exists in portions of the Midcontinent Independent System Operator, Inc. (MISO) region due to a sudden increase in demand or a shortage of electric energy or facilities for the generation or transmission of electric energy, and other causes. Issuance of this Order will meet the emergency and serve the public interest.

*BACKGROUND*

The J.H. Campbell Generating Plant (Campbell Plant) is a 1,420 MW coal-fired plant primarily owned by Consumers Energy Company (Consumers) and located in West Olive, Michigan. In 2021, Consumers announced that it planned to implement a "speed closure" of the Campbell Plant fifteen years before the end of its scheduled design life.[3] Instead of retiring the Campbell Plant at the end of its design life, Consumers planned to accelerate the Campbell Plant's retirement and discontinue its operations on May 31, 2025.

Order Nos. 202-25-3, 202-25-7, 202-25-9, 202-26-16, and 202-26-22, issued pursuant to FPA section 202(c), each required that the Campbell Plant remain in operation for 90 days, until August 21, 2025, November 19, 2025, February 17, 2026, May 18, 2026, and August 16, 2026, respectively. Those orders were based on my determination that emergency conditions existed in the region served by MISO.

Specifically, I determined that MISO likely faced tight reserve margins due to well-documented year-round resource adequacy concerns, particularly during periods of high demand or low generation resource output.[4] I determined that the continued operation of the Campbell Plant would provide additional generation capacity during

---

[1] 16 U.S.C. § 824a(c).

[2] 42 U.S.C. § 7151(b).

[3] *See* Consumers Energy, *Consumers Energy Announces Plan to End Coal Use by 2025; Lead Michigan's Clean Energy Transformation* (June 23, 2021), https://www.consumersenergy.com/news-releases/news-release-details/2021/06/23/consumers-energy-announces-plan-to-end-coal-use-by-2025-lead-michigans-clean-energy-transformation.

[4] *See, e.g.*, *Midcontinent Indep. Sys. Operator, Inc.*, DOE Order No. 202-25-9, at 1 (Nov. 18, 2025).

these periods, which would help prevent the potential loss of power to homes and businesses in the areas that might have been affected by curtailments or outages that would otherwise pose a risk to public health and safety.[5] I determined that the continued operation of the Campbell Plant was necessary to alleviate immediate and anticipated threats to reliability.[6]

My determination was based on a number of facts. First, the North American Electric Reliability Corporation (NERC) released its 2025 Summer Reliability Assessment on May 14, 2025. In its assessment, NERC stated that "[d]emand forecasts and resource data indicate that MISO is at elevated risk of operating reserve shortfalls during periods of high demand or low resource output."[7] In particular, NERC explained that the retirement of thermal generation capacity increased the likelihood of electricity supply shortfalls. NERC anticipated that the near-term period of greatest capacity shortfall for MISO would likely occur in August.[8]

Second, multiple generation facilities in Michigan have retired in recent years. According to the U.S. Energy Information Administration (EIA), "[s]ince 2020, about 2,700 megawatts of coal-fired generating capacity have been retired and no new coal-fired facilities are planned."[9] Additionally, EIA stated, "Michigan's nuclear power plants typically supplied about 30% of in-state electricity, but the amount of electricity generated by nuclear power plants in Michigan has declined as plants have been decommissioned."[10] The state's Big Rock Point nuclear power plant shut down in 1997, and the Palisades nuclear power plant closed in 2022. The Palisades plant remains unavailable, although the plant will reportedly resume service in 2026.[11]

Third, the Campbell Plant's retirement would have further decreased available dispatchable generation within MISO's service territory, adding to the loss of 1,575 MW of natural gas and coal-fired generation that has retired since the summer of 2024. Although MISO and Consumers have incorporated the planned retirement of the Campbell Plant into their supply forecasts and Consumers acquired a 1,200 MW natural

---

[5] *Id.* at 5; *see also id.* at 1, 8.

[6] *Id.* at 1.

[7] N. Am. Elec. Reliability Corp., *2025 Summer Reliability Assessment*, at 16 (May 2025), https://www.nerc.com/globalassets/programs/rapa/ra/nerc_sra_2025.pdf.

[8] *Id.*

[9] EIA, *Mich. State Profile & Energy Estimates* (Nov. 19, 2025), https://www.eia.gov/states/MI/analysis.

[10] *Id.*

[11] *See* Dustin Dwyer, *Palisades nuclear plant restart plans pushed back to "early 2026,"* MICH. PUB. (Dec. 17, 2025), https://www.michiganpublic.org/environment-climate-change/2025-12-17/palisades-nuclear-plant-restart-plans-pushed-back-to-early-2026; Will Wade, *Despite $80-billion commitment, nuclear plants face decadelong timeline to meet AI energy needs*, L.A. TIMES (Nov. 13, 2025), https://www.latimes.com/business/story/2025-11-13/despite-80-billion-commitment-nuclear-plants-face-decade-long-timeline-to-meet-ai-energy-needs.

gas power plant in Covert, Michigan, NERC has noted that "[e]scalating demand forecasts and uncertainty around new resource commercialization timing contribute to heightened resource adequacy concerns in the MISO area."[12]

Fourth, MISO's Planning Resource Auction Results for the 2026–2027 Planning Year, released in April 2026, notes that "capacity additions need to continue, given expected growth from new large loads."[13] Further, MISO reiterates that "while our market reforms have helped hold the line amidst tighter reserve margin compared to the prior decade, resource adequacy remains at risk, especially as demand for large load additions accelerate."[14]

*CONTINUING EMERGENCY CONDITIONS*

The emergency conditions that necessitated the issuance of Order Nos. 202-25-3, 202-25-7, 202-25-9, 202-26-16, and 202-26-22 continue, both in the near and long term.[15] The production of electricity from the Campbell Plant will continue to be a critical asset to maintain reliability in MISO. According to the EIA-923 Power Plant Operations Report's monthly generation data for May 2026, the total net generation for the Campbell Plant was 1,431,336 MWh from January 2026 to May 2026 for an average of 286,267 MWh per month.[16] The historic data of consistent generation indicates the Campbell plant is providing vital generation capacity to the region. From June 11, 2025, through November 5, 2025, MISO issued dozens of alerts to manage grid reliability in its

---

[12] NERC, *2025 Long-Term Reliability Assessment*, at 15 (Jan. 2026), https://www.nerc.com/globalassets/our-work/assessments/nerc_ltra_2025.pdf [hereinafter NERC *LTRA*].

[13] MISO, *Planning Res. Auction Results for Planning Year 2026/27*, at 3 (Apr. 2026) (Updated May 22, 2026) (MISO 2026–2027 Planning Resource Auction), https://cdn.misoenergy.org/2026%20PRA%20Results%20Posting%2020260522%20-%20Corrections754715.pdf.

[14] *Id.* at 7.

[15] It likely would be difficult for a coal-fired unit to resume operations once retired. Specifically, practical issues, such as employment, contracts, and permits, may greatly increase the timeline for resumption of operations during the period they are needed. Moreover, if Consumers was to begin disassembling the unit or other related facilities, the associated challenges would be greatly exacerbated. The costs and time of decommissioning a coal plant are extensive, and restarting such decommissioned plants would presumably cost the same as decommissioning in dollars and time, if not more. Thus, continuous operation is required in such cases so long as the Secretary determines a shortage exists and is likely to persist. *See* Jennifer Lessick et al., *Bus. Models for Coal Plant Decommissioning*, at 9–12 (Aug. 2021), https://www.pnnl.gov/main/publications/external/technical_reports/PNNL-31348.pdf.

[16] *See* EIA, *Form EIA-923 detailed data with previous form data (EIA-906/920)*, https://www.eia.gov/electricity/data/eia923/ (choose "2026: EIA-923 May 2026").

Central Region in response to hot weather, severe weather, high customer load, forced generation outages, and transfer capability limits.[17]

MISO's resource adequacy concerns were recently demonstrated during Winter Storm Fern, when it operated under a cold weather alert and declared conservative operations from January 23 through February 1, 2026. On January 24, MISO declared an Energy Emergency Alert (EEA) 1, as well as an EEA 2 "MaxGen" event for MISO's North and Central Regions due to generational outages, high demand, and transfer capability limits.[18]

MISO's year-round resource adequacy concerns are well documented. In 2021, MISO requested that the Federal Energy Regulatory Commission (FERC) approve its filing to revise its resource adequacy construct (including the Planning Resource Auction or PRA) to establish capacity requirements for each of the four seasons of the year rather than on an annual basis determined by peak summer demand.[19] MISO justified this revision by explaining that "[r]eliability risks associated with resource adequacy have shifted from 'Summer only' to a year-round concern."[20] MISO noted that over 60% of all "MaxGen" events (events when MISO initiates emergency procedures because of concerns over the adequacy of available generation) occurred outside of the summer season.[21]

In December 2023, MISO released its *Attributes Roadmap*, in which it presented "an in-depth look at the challenges of operating a reliable bulk electric system in a rapidly transforming energy landscape."[22] Among other things, this report described changes in the time of year during which the risk of the loss of load was greatest. For the 2023–2024 Planning Year, the greatest risk of loss of load was in the summer, but it is expected that by the summer of 2027, there will be an equal loss of load risk in both the summer and fall seasons.[23] MISO also projected that the risk of loss of load in the winter

---

[17] MISO, *Operations Rep.* (Sept. 16, 2025), https://cdn.misoenergy.org/20250916%20Markets%20Committee%20of%20the%20BOD%20Item%2005%20MISO%20Operations%20Report717458.pdf.

[18] MISO, *Operations Rep.*, at 10 (Mar. 24, 2026), https://cdn.misoenergy.org/20260324%20Markets%20Committee%20of%20the%20BOD%20Item%2008%20MISO%20Operations%20Report746763.pdf.

[19] *Midcontinent Indep. Sys. Operator, Inc.*, Transmittal Letter, Docket No. ER22-495-000 (filed Nov. 30, 2021). FERC accepted MISO's proposed tariff revisions on August 31, 2022. *Midcontinent Indep. Sys. Operator, Inc.*, 180 FERC ¶ 61,141 (2022), *order on reh'g & compliance*, 182 FERC ¶ 61,096 (2023).

[20] MISO Transmittal Letter at 3.

[21] *Id.* at 3–4.

[22] MISO, *Attributes Roadmap*, at 3 (Dec. 2023), https://cdn.misoenergy.org/2023%20Attributes%20Roadmap631174.pdf.

[23] *Id.* at 11.

and spring seasons will nevertheless increase over time, although not as high as in the summer or fall.[24]

More recently, MISO affirmed the resource adequacy problems occurring outside of its summer season in its 2024 report entitled, *MISO's Response to the Reliability Imperative*.[25] In a section of that report labeled "Risks in Non-Summer Seasons," MISO again stressed that it has resource reliability concerns outside of the summer season:

> Widespread retirements of dispatchable resources, lower reserve margins, more frequent and severe weather events and increased reliance on weather-dependent renewables and emergency-only resources have altered the region's highest historic risk profile, creating risks in non-summer months that rarely posed challenges in the past.[26]

These MISO studies indicate that the emergency conditions caused by the loss of generation capacity in MISO extend past the summer season.

Further, in January 2026, NERC released its 2025 Long-Term Reliability Assessment (LTRA).[27] NERC assessed that the MISO region is at high risk of energy shortfalls over the next five years,[28] stating that it faces significant reliability challenges as "projected resource additions do not keep pace with escalating demand forecasts and announced generator retirements."[29] This determination is based on the combination of accelerating demand growth from new data centers and the retirement of existing thermal generators.[30] Moreover, the 2025 NERC LTRA notes that "MISO's accredited thermal capacity has decreased by 8.8 GW, driven primarily by reductions in accredited capacity of existing facilities and retirements."[31] The report observes that winter peak periods are a particular concern, with projections showing "shortfalls in planned resources for winter peak periods."[32] However, NERC also concluded that "risks could expand into spring and fall generator maintenance periods when the available dispatchable generation is not enough to counter wind and solar variability when demand is high."[33]

The 2025–2026 NERC Winter Reliability Assessment (WRA) found the MISO region to be at normal risk in 2026 and elevated risk in 2027. The two previous winter

---

[24] *Id.*

[25] MISO, *MISO's Response to the Reliability Imperative* (updated Feb. 2024), https://cdn.misoenergy.org/2024+Reliability+Imperative+report+Feb.+21+Final504018.pdf.

[26] *Id.* at 12.

[27] *See* NERC *LTRA*, *supra* note 12.

[28] *Id.* at 6, 8.

[29] *Id.* at 8.

[30] *Id.* at 43.

[31] *Id.* at 15.

[32] *Id.*

[33] *Id.*

studies respectively characterized MISO as a region at elevated risk with the "[p]otential for insufficient operating reserves in above-normal conditions"[34] and noted that "[g]enerating capacity is 10 GW lower (-6.8%) compared to the prior winter as generators have retired, withdrawn from MISO's capacity market, or received lower winter accredited capacity."[35]

NERC released its 2026 Summer Reliability Assessment (SRA) on May 19, 2026. In its assessment, NERC stated that "MISO's peak load has increased by 2.5 GW from the 2025 SRA."[36] The 2026 SRA also projects that data center load will continue to accelerate in 2027 and beyond, potentially increasing reliability risk if capacity additions do not keep pace.[37] Furthermore, the 2026 SRA states that "[a]bove-normal summer peak load combined with low resource conditions could result in the need to employ operating mitigations . . . and EEAs."[38]

There continues to be tight capacity available during summer despite the recent "gains in offered capacity outpacing pressure of load growth" in the MISO region, as reported in its PRA for the 2026-2027 Planning Year.[39] MISO noted that "new generation capacity is coming online, but faster resource additions are still needed to support large-load growth and ensure resource adequacy."[40]

On June 4, 2026, the Organization of MISO States (OMS) and MISO issued the results of their 2026 survey, which has been conducted annually for many years to determine the degree to which expected capacity resources satisfy planning reserve margin requirements.[41] The 2026 OMS-MISO Survey presented projections of resource adequacy for the summer of 2026 and subsequent years and states "growth as submitted by [load serving entities or LSEs] continues to accelerate, with a [compound annual growth rate or CAGR] projected between 3.1% and 5.1% over [the next] five years."[42]

The OMS-MISO Survey further indicates that "[v]arious projected capacity scenarios and large load additions highlight increasing uncertainty and evolving risk"[43]

---

[34] NERC, *2023–2024 Winter Reliability Assessment*, at 5 (Nov. 2023), https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_WRA_2023.pdf.

[35] NERC, *2024–2025 Winter Reliability Assessment*, at 15 (Nov. 2024), https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_WRA_2024.pdf.

[36] NERC, *2026 Summer Reliability Assessment*, at 16 (May 2026), https://www.nerc.com/globalassets/our-work/assessments/nerc_sra_2026.pdf.

[37] *Id.*

[38] *Id.*

[39] MISO 2026–2027 Planning Resource Auction at 3.

[40] *Id.* at 2.

[41] OMS & MISO, *OMS-MISO Survey Results* (updated June 4, 2026) (2026 OMS-MISO Survey), https://cdn.misoenergy.org/20260604%20OMS-MISO%20Survey%20Results%20Workshop%20Presentation761711.pdf.

[42] *Id.* at 2.

[43] *Id.* at 3.

and observes various negative risks. Examples include intensification of winter reliability risks based on resource availability/performance, which exacerbates seasonal reliability vulnerabilities; delay of new resource deployment owing to persistent supply-chain disruptions, labor constraints and permitting challenges; resource adequacy pressures continuing from load growth driven by data centers, new industrial, and commercial development; and continued backlog and uncertainty related to resources with signed Generator Interconnection Agreements (GIA).[44] In addition, 87 GW of signed GIAs are not yet online, and 192 GW of active GIAs still under study.[45]

Finally, the OMS-MISO Survey lists ongoing challenges such as more frequent extreme weather; accelerating demand for electricity and large load interconnections; loss of accredited capacity and reliability attributes as resource mixes evolve; the increasing pace of new resources additions; addressing local reliability issues (load pocket); and evolving storage participation.[46]

NERC released its 2026 State of Reliability (SOR) on June 24, 2026. In the SOR, NERC identifies worsening reliability concerns tied to large-load integration and localized operating stress. In its technical discussion of major system events, NERC states "shoulder seasons have become increasingly challenging for Bulk Power System operators to manage, resulting in several recent instances of pre-contingent load shedding."[47] The SOR also finds large load growth is increasing reliability risk and states that "data center and computational loads continued emerging as a major reliability consideration due to their scale, speed of development, and unique operational characteristics."[48] Finally, data in the SOR shows that 2025 MISO summer and winter peak demands of 121.6 GW and 108.8 GW, respectively, met or exceeded extreme scenario levels showing how rapid load growth and extreme weather continue to be a real risk in MISO.[49]

MISO has been taking steps to address these projected deficits. For example, on June 6, 2025, MISO submitted a proposal to FERC to establish an Expedited Resource Addition Study (ERAS) process to provide a framework for the expedited study of interconnection requests to address urgent resource adequacy and reliability needs in the near term. This proposal was approved by FERC on July 21, 2025.[50] MISO's ERAS should help expedite the construction of needed new capacity; however, resources studied under the ERAS will have commercial operation dates that are at least three years away and are provided an additional three-year grace period to commence commercial

---

[44] *Id.* at 4.

[45] *Id.*

[46] *Id.* at 16.

[47] NERC, *2026 State of Reliability: Tech. Assessment of 2025 Bulk Power Sys. Performance*, at 5 (June 24, 2026), https://www.nerc.com/globalassets/programs/rapa/pa/nerc_sor_2026_technical_assessment.pdf.

[48] *Id.* at vii.

[49] *Id.* at 28, 30.

[50] *Midcontinent Indep. Sys. Operator, Inc.*, 192 FERC ¶ 61,064 (2025).

operations.[51] In addition, supply chain constraints impeding the acquisition of critical grid components, including large natural gas turbines and transformers, are likely to further hinder rapid construction and exacerbate reliability concerns.[52] Consequently, the new ERAS process is unlikely to result in the addition of any new generation capacity in the next few years.

Order Nos. 202-25-3, 202-25-7, 202-25-9, 202-26-16, and 202-26-22 were preceded by executive orders on January 20, 2025, and April 8, 2025, in which President Donald J. Trump underscored the dire energy challenges facing the Nation due to growing resource adequacy concerns. President Trump declared a national energy emergency in Executive Order No. 14156, "Declaring a National Energy Emergency," in which he determined that the "United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy."[53] The Executive Order adds, "hostile state and non-state foreign actors have targeted our domestic energy infrastructure, weaponized our reliance on foreign energy, and abused their ability to cause dramatic swings within international commodity markets."[54] In the subsequent Executive Order No. 14262, "Strengthening the Reliability and Security of the United States Electric Grid," President Trump emphasized that "the United States is experiencing an unprecedented surge in electricity demand driven by rapid technological advancements, including the expansion of artificial intelligence data centers and increase in domestic manufacturing."[55]

In addition, President Trump issued a White House Memo to the Secretary of Energy that emphasized the findings of Executive Order No. 14156, stating that "ensuring reliable coal supply chains and baseload power generation capacity is essential to the United States national defense . . . [w]ithout sufficient coal-fired baseload power, the United States will lack the stable electricity required to support defense installations, industrial expansion, and the high-energy demands of emerging technologies, such as

---

[51] NERC, *State of Reliability*, *supra* note 48, at 84.

[52] *See generally* Jared Anderson, *US Gas-Fired Turbine Wait Times as Much as Seven Years; Costs Up Sharply*, S&P GLOBAL (May 2025) ("With demand for natural gas-fired turbines in the US rapidly accelerating amid power demand growth forecasts driven by AI, manufacturing, and electrification, wait times for turbines are anywhere between one and seven years depending on the model, and costs have increased considerably, experts told Platts."), https://www.spglobal.com/energy/en/news-research/latest-news/electric-power/052025-us-gas-fired-turbine-wait-times-as-much-as-seven-years-costs-up-sharply.

[53] Exec. Order No. 14156, 90 Fed. Reg. 8433 (Jan. 20, 2025), https://www.federalregister.gov/documents/2025/01/29/2025-02003/declaring-a-national-energy-emergency.

[54] *Id.*

[55] Exec. Order No. 14262, 90 Fed. Reg. 15521 (Apr. 8, 2025), https://www.federalregister.gov/documents/2025/04/14/2025-06381/strengthening-the-reliability-and-security-of-the-united-states-electric-grid.

artificial intelligence."[56] The President "further determine[d] that action to expand coal supply chain capacity and baseload generation availability is necessary to avert an industrial resource or critical technology item shortfall that would severely impair national defense capability."[57]

Further, the Department detailed the myriad challenges affecting the Nation's energy systems in its July 2025 "Resource Adequacy Report: Evaluating the Reliability and Security of the United States Electric Grid," issued pursuant to the President's directive in Executive Order No. 14262. The Department concluded that "[a]bsent decisive intervention, the Nation's power grid will be unable to meet projected demand for manufacturing, re-industrialization, and data centers driving artificial intelligence (AI) innovation."[58] The prolific growth of data centers for the development of AI, as well as their immense energy needs, presents a new and unexpected source of load growth. This growth is illustrated by the fact that there are more than twenty AI companies operating in Michigan alone.[59] In addition, as just one example, Consumers has announced an additional 1 GW of new power to a planned hyperscale data center and "continue[s] to see positive momentum with data centers within the 9 GW pipeline . . . ."[60]

Grid operators—including MISO itself—have also acknowledged the Nation's current energy crisis. For instance, during a March 25, 2025, hearing before the House Committee on Energy and Commerce, MISO's Senior Vice President for Planning and Operations, Jennifer Curran, testified that "the MISO region faces resource adequacy and reliability challenges due to the changing characteristics of the electric generating fleet, inadequate transmission system infrastructure, growing pressures from extreme weather, and rapid load growth."[61] Ms. Curran also described "much stronger growth [in demand

---

[56] Memorandum from President Donald J. Trump to the Secretary of Energy (Apr. 20, 2026) ("Presidential Determination Pursuant to Section 303 of the Defense Production Act of 1950, as Amended, on Coal Supply Chains and Baseload Power Generation Capacity"), https://www.whitehouse.gov/presidential-actions/2026/04/presidential-determination-pursuant-to-section-303-of-the-defense-production-act-of-1950-as-amended-on-coal-supply-chains-and-baseload-power-generation-capacity/.

[57] *Id.*

[58] U.S. Dep't of Energy, *Res. Adequacy Rep.: Evaluating the Reliability & Sec. of the U.S. Elec. Grid*, at 1 (July 2025), https://www.energy.gov/sites/default/files/2025-07/DOE%20Final%20EO%20Report%20%28FINAL%20JULY%207%29.pdf.

[59] Ekku Jokinen, *Top 21 A.I. Cos. in Mich.* , INVEN (last accessed Aug. 13, 2025), https://www.inven.ai/company-lists/top-21-artificial-intelligence-companies-in-michigan.

[60] *See* Zachary Skidmore, *Mich. util. Consumers Energy to provide 1GW of power to new hyperscale data center*, DATA CENTER DYNAMICS (Aug. 5, 2025) (quoting Consumers CEO Garrick Rochow), https://www.datacenterdynamics.com/en/news/michigan-utility-consumers-energy-to-provide-1gw-of-power-to-new-hyperscale-data-center/.

[61] *Keeping the Lights On: Examining the State of Regional Grid Reliability; Hearing Before the House Committee on Energy and Commerce, Subcommittee on Energy*, 119th Cong. 5 (2025) (statement of Ms. Jennifer Curran, Senior Vice President

for electricity] from continued electrification efforts, a resurgence in manufacturing, and an unexpected demand for energy-hungry data centers to support artificial intelligence."[62] She added, "A growing reliability risk is that the rapid retirement of existing coal and gas power plants threatens to outpace the ability of new resources with the necessary operational characteristics to replace them."[63]

Pursuant to section 202(c)(4)(B) of the FPA, DOE has consulted with the primary Federal agency with expertise in the environmental interest protected by the laws or regulations that may conflict with this Order. The agency did not submit additional conditions for inclusion in this Order.

## *ORDER*

FPA section 202(c)(1) provides that whenever the Secretary determines "that an emergency exists by reason of a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation or transmission of electric energy," the Secretary has the authority "to require by order . . . such generation, delivery, interchange, or transmission of electric energy as in [his] judgment will best meet the emergency and serve the public interest."[64] This statutory language constitutes a specific grant of authority to the Secretary to require the continued operation of the Campbell Plant when the Secretary has determined that such operation will best meet an emergency.

As described above, the emergency conditions resulting from increasing demand and shortage of electric energy from premature retirement of the Campbell Plant will continue in the near term and are also likely to continue in subsequent years. This could lead to the loss of power to homes and businesses in the areas affected by curtailments or outages, presenting a risk to public health and safety.

I have determined that, to best meet the emergency arising from increased demand, determined shortage, and other causes, and to serve the public interest under FPA section 202(c), the Campbell Plant shall be made available for operation through November 14, 2026.[65]

---

for Planning and Operations, MISO), https://www.congress.gov/119/meeting/house/118040/witnesses/HHRG-119-IF03-Wstate-CurranJ-20250325.pdf.

[62] *Id.* at 6.

[63] *Id.* at 7.

[64] Although the text of FPA section 202(c) grants this authority to "the Commission," section 301(b) of the Department of Energy Organization Act transferred this authority to the Secretary of the Department of Energy. *See* 42 U.S.C. § 7151(b).

[65] 16 U.S.C. § 824a(c)(4).

Based on my determination of an emergency set forth above, I hereby order:

A. From August 17, 2026, MISO and Consumers shall take all measures necessary to ensure that the Campbell Plant is available to operate. For the duration of this Order, MISO is directed to take every step to employ economic dispatch of the Campbell Plant to minimize costs to ratepayers. Following the conclusion of this Order, sufficient time for orderly ramp down is permitted, consistent with industry practices. Consumers is directed to comply with all orders from MISO related to the availability and dispatch of the Campbell Plant.

B. To minimize adverse environmental impacts, this Order limits operation of dispatched units to the times and within the parameters as determined by MISO pursuant to paragraph A. MISO shall provide a daily notification to the Department (via AskCR@hq.doe.gov) reporting whether the Campbell Plant has operated in compliance with this Order.

C. All operations of the Campbell Plant must comply with applicable environmental requirements, including but not limited to monitoring, reporting, and recordkeeping requirements, to the maximum extent feasible while operating consistent with the emergency conditions. This Order does not provide relief from any obligation to pay fees, or purchase offsets or allowances for emissions that occur during the emergency conditions, or to use other geographic or temporal flexibilities available to generators.

D. By August 31, 2026, MISO is directed to provide the Department (via AskCR@hq.doe.gov) with information concerning the measures it has taken and is planning to take to ensure the operational availability of the Campbell Plant consistent with this Order. MISO shall also provide such additional information regarding the environmental impacts of this Order and its compliance with the conditions of this Order, in each case as requested by the Department from time to time.

E. Consumers is directed to file with FERC tariff revisions or waivers to effectuate this Order, as needed. Rate recovery is available pursuant to 16 U.S.C. § 824a(c).

F. This Order shall not preclude the need for the Campbell Plant to comply with applicable state, local, or Federal law or regulations following the expiration of this Order.

G. Because this Order is predicated on the shortage of facilities for generation of electric energy and other causes, the Campbell Plant shall not be considered a capacity resource.

H. This Order shall be effective on August 17, 2026, through November 14, 2026, with the exception of applicable compliance obligations in paragraph D.

Issued in Washington, D.C. on this 14th day of August 2026.

Chris Wright
Secretary of Energy

cc:

**Federal Energy Regulatory Commission**
Chairman Laura V. Swett
Commissioner David Rosner
Commissioner Lindsay S. See
Commissioner Judy W. Chang
Commissioner David A. LaCerte

**Michigan Public Service Commission**
Chairman Dan Scripps
Commissioner Katherine Peretick
Commissioner Shaquila Myers

# Exhibit B

**UNITED STATES OF AMERICA**
**BEFORE THE**
**UNITED STATES DEPARTMENT OF ENERGY**

**Order No. 202-26-39**

---

# REQUEST FOR INTERVENTION, REHEARING, AND STAY BY MICHIGAN ATTORNEY GENERAL DANA NESSEL


Dana Nessel
Michigan Attorney General

Michael E. Moody (P51985)
Lucas Wollenzien (P86928)
Assistant Attorneys General
Special Litigation Division
P.O. Box 30755
Lansing, MI 48909
517-335-7627
MoodyM2@michigan.gov
WollenzienL@michigan.gov

Christopher M. Bzdok (P53094)
Special Assistant Attorney General
chris@tropospherelegal.com


Dated: September 11, 2026

## TABLE OF CONTENTS

I. MOTION TO INTERVENE ........ 2

II. BACKGROUND ........ 4

A. DOE's Historical Use of Section 202(c) ........ 4

B. Executive Order 14262 and the White House Strategy to Prop Up the Coal Industry ........ 9

C. The Planned Retirement of JH Campbell ........ 12

D. The Campbell I Order and Michigan AG's Requests for Rehearing ........ 24

E. The July 7 Resource Adequacy Report ........ 27

F. The Campbell II Order ........ 29

G. The September 8 Rehearing Order ........ 32

H. The Campbell III Order ........ 33

I. The Campbell IV Order ........ 34

J. The Campbell V Order ........ 35

K. The Campbell VI Order ........ 36

III. STATEMENT OF ISSUES AND SPECIFICATIONS OF ERROR ........ 38

IV. REQUEST FOR REHEARING ........ 39

A. The Department Has Failed to Establish the Existence of an Emergency under Section 202(c) or the Department's Regulations Implementing Section 202(c) ........ 39

B. The Order Intrudes on Authority Reserved to States and to Other Federal Regulators ........ 61

C. The Order Fails to Present Substantial Evidence for its Emergency Determination and Fails to Exercise Reasoned Decision-making by Ignoring Critical Facts ........ 66

D. The Department's Direction that MISO Operate J.H. Campbell Using "Economic" Dispatch Is Inconsistent with its Authority under Section 202(c) and is Arbitrary and Capricious ..... 73

E. The Department failed to limit its remedy as required by 202(c)(2).... 83

F. The Order Violates NEPA ..... 89

V. REQUEST FOR STAY ..... 92

A. Michigan and its People Will Suffer Irreparable Injury Absent a Stay ..... 92

B. A Stay Would Not Harm Any Other Party ..... 93

C. A Stay Is In the Public Interest ..... 93

VI. THE D.C. CIRCUITS DECISION IN *PEOPLE OF THE STATE OF MICHIGAN V DOE, ET AL* ..... 94

VII. CONCLUSION ..... 95

Under section 313*l* of the Federal Power Act ("the Act"), 16 U.S.C. § 825*l*, Michigan Attorney General Dana Nessel, on behalf of the people of the State of Michigan, requests that the Department of Energy (Department or DOE) grant rehearing of Order No. 202-26-39 (August 14, 2026) ("Campbell VI Order" or "Order"). The Order invokes the Department's emergency authority under section 202(c) to command the J.H. Campbell power plant (J.H. Campbell or the Campbell Plant) in West Olive, Michigan to remain in operation until November 14, 2026, thereby extending the effect of Order No. 202-25-3 (the "Campbell I Order"), Order No. 202-25-7 (the "Campbell II Order"), Order No. 202-25-9 (the "Campbell III Order"), Order No. 202-26-16 (the "Campbell IV Order"), and Order No. 202-26-22 (the "Campbell V Order"), which have prevented the long-scheduled retirement of that facility.

The Order is an unlawful abuse of the Department's emergency authority. The Department has historically reserved section 202(c) for real emergencies like natural disasters and extreme weather and has typically acted at the behest of grid operators or governmental bodies. In the Order, acting on its own motion and without notice, the Department declares that the retirement of J.H. Campbell presents an emergency. But the Order's emergency determination does not withstand scrutiny.

The scheduled retirement of J.H. Campbell was the culmination of a carefully planned process that unfolded over four years. Under the oversight of the Michigan Public Service Commission (MPSC), Consumers Energy (Consumers) executed a plan to retire the plant and replace it with resources that would increase Consumers' available generation capacity at a lower overall cost. J.H. Campbell's retirement was

also studied carefully by the Midcontinent Independent System Operator (MISO), the regional grid operator, which determined that the facility could retire without causing negative impacts on reliability.

In the Order, the Department purports to apply section 202(c) in the absence of any emergency and unhindered by the statutory requirement that the actions it orders go no further than necessary to address an emergency if it did exist. The Department's unlawful action imposes unnecessary costs on ratepayers, causes air pollution in Michigan and neighboring states, and intrudes on the authority of states and the Federal Energy Regulatory Commission to regulate the resource adequacy of our electric grid.

## I. MOTION TO INTERVENE

The Michigan Attorney General,[1] on behalf of the people of the State of Michigan, moves to intervene in this proceeding and thereby to become a party for purposes of Section 313*l* of the Act, 16 U.S.C. § 825*l*. As with the five prior Campbell Orders, the People of the State of Michigan have an interest in and are aggrieved by the Campbell VI Order in several ways. First, households and businesses in Michigan and the State itself will pay higher electricity bills because of the Order. The retirement of J.H. Campbell and its replacement with more cost-effective resources were elements of a careful plan expected to save Michigan ratepayers nearly $600

---

[1] *See* MCL 14.28 ("The attorney general . . . may, when in [her] own judgment the interests of the state require it, intervene in and appear for the people of this state in any other court or tribunal, in any cause or matter, civil or criminal, in which the people of this state may be a party or interested."). *See also In re Certified Question*, 465 Mich 537, 543-545; 638 NW2d 409 (2002); *Gremore v Peoples Community Hospital Authority*, 8 Mich App 56; 153 NW2d 377 (1967); *People v O'Hara*, 278 Mich 281; 270 NW2d 298 (1936).

million.[2] By ordering the continued operation of J.H. Campbell, the Order ensures that Michigan ratepayers will pay higher costs. Although the precise amount of costs is not yet known, Consumers Energy, the operator and primary owner of the Campbell Plant, has asserted a total net financial impact of $259 million from the date the first Order became effective through June 30, 2026 from the Department's Campbell orders.[3]

Second, the People of the State of Michigan will suffer environmental harms as a result of the Order. J.H. Campbell is a significant source of particulate matter, nitrogen oxides, sulfur oxides, and carbon dioxide,[4] among other pollutants. By continuing to prolong the operations of J.H. Campbell, the Order will increase the amount of pollution emitted into the air and water in Michigan, causing harms to the public health and welfare.

Third, the retirement of J.H. Campbell on May 31, 2025, was a critical element of a settlement agreement in Michigan Public Service Commission Case (MPSC) No. U-21090, to which the Michigan Attorney General was a party. Because the Order continues to deprive the Michigan Attorney General of the benefit of her bargain under the settlement agreement, the Michigan Attorney General will suffer a discrete and separate harm as a result of the Order.

---

[2] *See* Michigan Public Service Commission Case No. U-21090-0867, Reply Brief of Consumers at 1 – 2, available at https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/0688y0000032ZSXAA2.

[3] *Consumers Energy Company Form 10-Q For the Quarterly Period Ended June 30, 2026*, 63, Attachment NN.

[4] *See* In the Matter of the Application of Consumers Energy Co. for Approval of Its Integrated Res. Plan Pursuant to Mcl 460.6t & for Other Relief., No. U-21090, 2022 WL 2915368, at *73 (June 23, 2022).

Finally, state authority over generation resources has been a fundamental principle of the Federal Power Act for nearly a century. Federal intrusion in that traditional sphere of state control is permitted only consistent with specific procedures not followed here. Michigan's sovereign interest in seeing its state laws followed and not unlawfully disturbed further warrants the Attorney General's intervention.[5]

## II. BACKGROUND

### A. DOE's Historical Use of Section 202(c).

Prior to the recent spate of unlawful 202(c) orders in 2025 and 2026,[6] the Department used section 202(c) sparingly. Historically, the Department used this authority only in response to concrete, particularized emergencies, and subject to limitations to ensure that the Department's reach extends no further than necessary to address the emergency at hand.

Between enactment of the Department of Energy Organization Act in 1977, Pub. L. No. 95-91, and the end of 2024, the Department appears to have used section 202(c) nineteen times, not counting amendments. DOE's first usage of section 202(c) came in response to the California Energy Crisis in 2000.[7] That order was followed

---

[5] *See Alaska v. U.S. Dep't of Transp*., 868 F.2d 441, 443 (D.C. Cir. 1989) ("It is common ground that States have an interest, as sovereigns, in exercising 'the power to create and enforce a legal code.'") (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601 (1982)).

[6] These orders – for the Campbell, Culley, Schahfer, Eddystone, Centralia, and Craig generating plants – are compiled in NERC, 2026 Summer Reliability Assessment (May 2026), Attachment OO, p. 9.

[7] DOE, *Order Pursuant to Section 202(c) of the Federal Power Act* (Dec. 14, 2000). Section 202(c) was used by the Federal Power Commission prior to the Department of Energy Organization Act's creation of DOE. Those uses were generally limited to orders directing interconnection as a result of discrete and sudden emergencies or war. *See* Benjamin Rolsma, *The New Reliability Override*, 57 U. Conn. L. Rev. 789, 822 (2025).

by two others directing the operation of the Cross-Sound Cable, a submarine transmission line connecting New York and Connecticut that was complete but that had been delayed from entering service due to environmental permitting issues.[8] But by far the most common usage – comprising 13 of 19 instances – has been in response to extreme weather events such as hurricanes,[9] extreme cold,[10] and extreme heat.[11] In each of these weather-driven cases, the exercise of emergency power was requested by the relevant system operator or responsible utility, or both. And in each, DOE carefully limited its remedy to ensure that generation facilities were only ordered to run in circumstances necessary to address the emergency and in a manner so as to minimize any conflict with environmental requirements.[12] DOE also limited the duration of those orders to the minimum period necessary to address the emergency, often shorter than 10 days.[13]

Prior to the Campbell I Order, DOE had used section 202(c) on three occasions to delay the retirement of generation facilities.[14] These cases had key features in common. In each: (i) the order was requested by a system operator or governmental

---

[8] *See* DOE Order No. 202-02-1 (Aug. 16, 2002); DOE Order No. 202-03-01 (Aug. 14, 2003).
[9] *See* DOE Order Nos. 202-05-1 & -2 (Sept. 28, 2005) (response to Hurricane Rita); DOE Order No. 202-08-1 (Sept. 14, 2008) (Hurricane Ike); DOE Order No. 202-20-1 (Aug. 27, 2020) (Hurricane Laura); DOE Order No. 202-24-1 (Oct. 9, 2024) (Hurricane Milton).
[10] *See* DOE Order No. 202-21-1 (Feb. 14, 2021); DOE Order No. 202-22-3 (Dec. 23, 2022); DOE Order No. 202-22-4 (Dec. 24, 2022).
[11] *See* DOE Order No. 202-20-2 (Sept. 6, 2020) (responding to extreme heat in California); DOE Order No. 202-21-2 (responding to extreme heat, wildfires and drought in California); DOE Order Nos. 202-22-1 & 2 and amendments (same).
[12] *See supra* notes 4, 5, 7.
[13] *Id.*
[14] Nor did the DOE's predecessor agency, the Federal Power Commission, use section 202(c) to delay retirement of any generation units between the section's enactment in 1935 and the formation of DOE in 1977. *See* Rolsma, 57 U. Conn. L. Rev. at 843-46.

body; (ii) the generation facility had ceased or would soon cease operation due to an inability to comply with environmental laws; (iii) the request aimed to address a concrete and particularized emergency threatening an imminent loss of load; and, (iv) DOE tailored its order to go no further than necessary to address the emergency.

The first such instance came in 2004, when the District of Columbia's Public Service Commission requested an order directing the continued operation of a power plant located in Alexandria, Virginia, owned by the Mirant Corporation (Mirant). After its state regulator found the plant to be out of compliance with its air permit, Mirant abruptly announced that the plant would close.[15] The D.C. Public Service Commission, supported by the local utility, PEPCO, explained that the Mirant facility directly powered downtown D.C. and that, without it, critical federal infrastructure faced an unacceptable risk of blackout.[16] Before acting on the request, the Department commissioned an analysis from the Oak Ridge National Laboratory that confirmed the threat that the plant's closure would pose to reliability in D.C.[17] Based on that study, and based on the severity of the harm that could result from a prolonged power outage to downtown D.C., the Department issued an order directing the continued operation of the Mirant facility.[18] The Department took pains, however, to limit its order to go no further than necessary to address the emergency. The

---

[15] DOE Order No. 202-05-3 (Dec. 20, 2005) at 1 (explaining that Mirant provided emissions information to its state regulator on August 19, 2005, the regulator demanded immediate action that same day, and Mirant decided to cease operations on August 24).
[16] *Id.* at 2.
[17] *Id.* at 3 – 4.
[18] *Id.* at 5 – 8.

Department directed Mirant to maintain the facility's capacity to respond when needed, but only ordered it to run when one or both of the 230 kV transmission lines serving downtown D.C. were out of service.[19]

Twelve years later, in 2017, the Department received a request from the Grand River Dam Authority (GRDA), an Oklahoma state agency, to direct the continued operation of Unit No. 1 at the Grand River Energy Center. GRDA explained that the Grand River Energy Center was needed to provide dynamic reactive power support to the local grid, a fact confirmed by the region's Reliability Coordinator, the Southwest Power Pool (SPP). GRDA explained, however, that it would be unable to provide reactive power without action from DOE. Unit No.1, the subject of the request, had been ordered to close by an Administrative Order of the Environmental Protection Agency. Unit No. 2 had been struck by lightning and was under repair. And, construction of the new Unit No. 3 had been delayed because flooding in Louisiana interfered with the fabrication of essential project materials.[20] The Department granted GRDA's request, ordering Unit No. 1 to remain in operation for 90 days or until Unit No. 2 or Unit No. 3 were brought online, whichever came first.[21] The Department strictly limited its remedy, directing GRDA only to provide "dynamic

---

[19] *Id.* at 10 – 11.
[20] Letter Request of Grand River Dam Authority, April 11, 2017. Available at https://www.energy.gov/sites/default/files/2017/05/f34/GRDA%20public%20202%28c%29%20letter.pdf.
[21] DOE Order No. 202-17-1 at 2.

reactive power support and not real power generation, and only when called upon by SPP for reliability purposes."[22]

Later that year, the Department received a pair of requests from PJM and Dominion Virginia (Dominion) to direct the continued operation of Units 1 and 2 of the Yorktown Power Station. PJM and Dominion explained that, based on PJM load flow studies, these units were necessary to prevent uncontrolled power disruptions and shedding of critical loads in the North Hampton Roads area east of Richmond.[23] DOE issued an order directing Dominion to maintain operation at the two units, but to dispatch those units "only when called upon by PJM for reliability purposes."[24] DOE later extended the order several times due to the delayed completion of the transmission line needed to resolve the reliability issue. In doing so, DOE cited the "imminent" risk of load-shedding in the North Hampton Roads area absent extension of the order.[25] In its ordering paragraphs, the Department continued to limit dispatch of the units only when called upon by PJM for reliability purposes and, further, directed PJM and Dominion to exhaust available resources, including demand response and behind-the-meter generation resources, prior to operating the units.[26]

---

[22] *Id.*
[23] DOE Order No. 202-17-2, at 1.
[24] *Id.* at 2.
[25] DOE Order No. 202-17-4, Summary of Findings, Sept. 14, 2017.
[26] DOE Order No. 202-17-4 at 2.

### B. Executive Order 14262 and the White House Strategy to Prop Up the Coal Industry.

Since the beginning of 2025, the White House and the Department have sought to radically transform how section 202(c) of the Federal Power Act is applied, departing in almost every material respect from the longstanding approach described above. As shown below, the Order cannot be understood intelligibly as a response to a discrete event or emergency akin to past orders under section 202(c). Rather, it can only be understood as part of a long-term and multi-part strategy to preference coal and other fossil fuel generation over politically disfavored energy sources under the guise of grid reliability concerns.

On April 8, 2025, President Trump issued Executive Order 14262, *Strengthening the Reliability and Security of the United States Electric Grid*.[27] The Order, as well as the prior Campbell I Order, are properly considered in the context of Executive Order 14262 that preceded and effectively directed them. Executive Order 14262 directs DOE to: streamline and expedite the issuance of emergency orders under section 202(c) and directs DOE to then take a subsequent series of actions related to use of section 202(c) authority, with the ultimate goal of mandating retention of a broad swath of fossil generation resources in the name of meeting White House-directed national resource adequacy objectives. This includes:

- the development of a uniform methodology for assessing capacity reserve margins and identifying "at-risk" regions;

[27] Executive Order 14262, 90 Fed. Reg. 15521 (April 14, 2025).

- establishment of a process by which the developed methodology and any analysis results are regularly assessed; and,
- establishment of a protocol to identify generation resources within a region that are critical to system reliability, a mechanism under section 202(c) to ensure such generation resources are appropriately retained and, for resources over 50MW, are prevented from leaving the bulk-power system or converting their source of fuel.[28]

As explained in more detail below, DOE published its resource adequacy analysis on July 7, which the Department has relied on to support the Order.

Executive Order 14262 is premised on an allegedly dire need to meet "existing capacity challenges" and the "unprecedented surge in electricity demand" that are placing "a significant strain on our Nation's electric grid" with "reliable supply of energy from all available electric generation sources." In this way, it builds on the earlier-issued Executive Order 14,156, *Declaring a National Energy Emergency*.[29] But a broader look at the Administration's energy policy makes clear that this Executive Order, and DOE's section 202(c) implementing orders, like the Campbell VI Order aimed at propping up the J.H. Campbell plant, are, in fact, part of a broader pattern in which the Administration has expansively invoked emergency powers to achieve long-standing political objectives,[30] rather than respond to genuine,

---

[28] Executive Order 14262 section 3(b), (c).
[29] Executive Order 14262, section 2.
[30] The President has declared nine national emergencies in 2025 alone—more than any other President in the first seven months of an administration. *See* https://www.brennancenter.org/our-work/research-reports/declared-national-emergencies-under-national-emergencies-act.

unforeseen crises. The Executive Order was issued concurrently with three other executive actions aimed at supporting the coal industry that were announced at a White House political event explicitly focused on that objective.[31] This event, and the related Executive Order, are one of several in a series of public actions by the Administration aimed at reversing coal plant retirements and promoting fossil fuel generation.

That alleged grid reliability concerns are purely pretext is made clear by the simultaneous efforts by the Administration to actively disrupt the deployment of new, lower-cost electric generating capacity to help meet the very resource adequacy "crisis" it claims to be motivating DOE's extraordinary exercise of emergency power. Over the past year, the Administration has taken a variety of actions to actively slow deployment of wind and solar energy, despite the fact that these resources generally are among the fastest, lowest cost tools available to meet new electric demand.[32] This has included subjecting these resources to substantial additional political review;[33] adopting new policies to put a thumb on the scale against deployment of these

---

[31] New York Times, Trump Signs Orders Aimed at Reviving a Struggling Coal Industry (April 8, 2025); Executive Order 14261, Reinvigorating Americans Beautiful Clean Coal Industry and Amending Executive Order 14241, 90 Fed. Reg. 15517 (April 14, 2025); Executive Order 14260, Protecting American Energy from State Overreach, 90 Fed. Reg. 15513 (April 14, 2025); Regulatory Relief for Certain Stationary Sources To Promote American Energy, 90 Fed. Reg. 16777 (April 21, 2025).

[32] U.S. DOE, Clean Energy Resources to Meet Data Center Electricity Demand, https://www.energy.gov/gdo/clean-energy-resources-meet-data-center-electricity-demand [https://perma.cc/M2L3-LPUN ] ("Today, solar energy, land-based wind energy, battery storage, and energy efficiency are some of the most rapidly scalable and cost competitive ways to meet increased electricity demand from data centers").

[33] U.S. Dep't of Interior, Memorandum from Gregory Wischer, Deputy Chief of Staff – Policy, to Assistant Secretaries, Bureau and Office Heads (July 15, 2025), https://www.doi.gov/media/document/departmental-review-procedures-decisions-actions-consultations-and-other

resources on federal land,[34] or in highway corridors;[35] and making it more difficult for these resources to claim tax credits.[36] Perhaps most stark has been the issuance of stop work orders halting the completion of new, largely-constructed energy projects,[37] thereby disrupting their ability to provide hundreds of megawatts of electric generating capacity that their regions are counting on to meet the very increases in demand allegedly motivating the Administration's section 202(c) activities.[38]

### C. The Planned Retirement of JH Campbell.

#### *i. Description of J.H. Campbell.*

J.H. Campbell is a three-unit coal-fired power plant with a total rated net generating capability of approximately 1,420 megawatts (MW).[39] Unit 1 is 63 years old and has a rated net generating capability of 261 MW and an effective maximum capacity of 220 MW.[40] Unit 2 is 58 years old and has a rated net generating capability

---

[34] U.S. Dept't of Interior, Order No. 3438, Managing Federal Energy Resources and Protecting the Environment (Aug. 1, 2025), https://www.doi.gov/document-library/secretary-order/so-3438-managing-federal-energy-resources-and-protecting

[35] U.S. Dep't of Transportation, President Trump's Transportation Secretary Sean P. Duffy: Biden-Buttigieg Ignored the Dangers of Wind Turbines Near Railroads & Highways, Put Climate Religion Ahead of Safety (July 29, 2025), https://www.transportation.gov/briefing-room/president-trumps-transportation-secretary-sean-p-duffy-biden-buttigieg-ignored.

[36] Executive Order 14315 § 3(a) (directing the Secretary of Treasury to "strictly enforce the termination of the clean electricity production and investment tax credits"); IRS Notice 2025-42, *available at* https://www.irs.gov/pub/irs-drop/n-25-42.pdf.

[37] Orsted, Revolution Wind receives offshore stop-work order from US Department of the Interior's Bureau of Ocean Energy Management (Aug. 22, 2025), https://orsted.com/en/company-announcement-list/2025/08/revolution-wind-receives-offshore-stop-work-order--145387701; *see also* Diana DiGangi, Trump administration to revoke approval for 2.2-GW Maryland Offshore Wind, Utility Dive (Aug. 27, 2025), https://www.utilitydive.com/news/trump-maryland-offshore-wind-revoke-approval-ocean-city/758717/

[38] ISO Newswire, ISO-NE statement on Revolution Wind stop work order, https://isonewswire.com/2025/08/25/iso-ne-statement-on-revolution-wind-stop-work-order/

[39] Michigan Public Service Commission (MPSC) Case No. U-21585, Direct Testimony of Richard Blumenstock, p. 7, Table 1 (5 Tr 1394-95), Attachment E; *see also* Consumers Energy, J.H. Campbell Complex Retirement,https://www.consumersenergy.com/about-us/electric-generation/campbell-complex-retirement, last checked June 11, 2025 (reporting 1,450 MW of capacity).

[40] Id.

of 356 MW and an effective maximum capacity of 260 MW.[41] Unit 3 is 45 years old and has a rated net generating capability of 843 MW and an effective maximum capacity of Unit 3 is 700 MW.[42] Consumers operates the entire Campbell Plant and is the sole owner of Units 1 and 2. Consumers owns about 93% of Unit 3, the Michigan Public Power Agency owns 4.8% of Unit 3, and Wolverine Power Supply Cooperative owns less than 2% of Unit 3.[43]

J.H. Campbell and Consumers' service territory are located within MISO Local Resource Zone 7. Most of the lower peninsula of Michigan is in MISO Zone 7, except for a small area in the southwest portion of the State, which is in PJM.

*ii. State proceeding approving the retirement of J.H. Campbell.*

In 2021, Consumers proposed to retire J.H. Campbell in 2025 for economic reasons. The MPSC thoroughly reviewed the proposed retirement for a year in an integrated resource plan (IRP) proceeding governed by Michigan statute.[44] No party in the case opposed the retirement of Units 1 and 2; and only a few opposed the retirement of Unit 3.[45] The MPSC ultimately approved Consumers' proposed retirement of J.H. Campbell in a settlement joined by most of the parties to the case. A single party appealed the MPSC's decision to approve the retirement of Unit 3, but

---

[41] Id.
[42] Id.
[43] MPSC Case No. U-21090 (Kapala Direct, 7 Tr 1739), Attachment F; Ex. WPSC-1, p. 19 (Agreement, p. 11), section 2.1, available at https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/0688y000001QqldAAC.
[44] MCL 460.6t.
[45] MPSC Case No. U-21090, Order approving contested settlement, June 23, 2022, p. 8, Attachment G.

the Michigan Court of Appeals affirmed that decision in 2023.[46] Both the MPSC and the appeals court found that Michigan would still have more than enough generating capacity to serve demand after J.H. Campbell retired.[47]

Michigan's IRP statute requires electric utilities whose rates are regulated by the MPSC to periodically file an IRP. The IRP is a projection of the utility's load obligations and a plan to meet those obligations.[48] The IRP statute directs the MPSC to approve a plan if the MPSC determines that it "represents the most reasonable and prudent means of meeting the electric utility's energy and capacity needs."[49] To make that decision, the statute instructs the MPSC to consider whether the IRP appropriately balances seven statutory factors: (i) resource adequacy and capacity to serve anticipated peak electric load, applicable planning reserve margin, and local clearing requirement; (ii) compliance with applicable state and federal environmental regulations; (iii) competitive pricing; (iv) reliability; (v) commodity price risks; (vi) diversity of generation supply; and (vii) whether proposed levels of peak load reduction and energy waste reduction are reasonable and cost effective.[50]

The IRP statute also directs the MPSC to establish – among other things – computer modeling scenarios that must be used to analyze the costs of possible plans in an IRP, including costs associated with plant retirement dates.[51] In the modeling

---

[46] Wolverine Power Supply Coop., Inc. v Michigan Public Service Commission (In re Consumers Energy), 2023 Mich. App. LEXIS 2045; 2023 WL 2620437 (March 23, 2023).
[47] *Id.*
[48] MCL 460.6t(3).
[49] MCL 460.6t(8)(a).
[50] Id.
[51] MCL 460.6t(1).

used to prepare its 2021 IRP, Consumers determined that it would be most cost-effective to retire the entire J.H. Campbell plant in 2025.[52] Later in the proceeding, Consumers conducted more modeling that compared other possible retirement dates to a 2025 retirement and again concluded that the most cost-effective retirement date was 2025.[53] Among other things, parties to the IRP case noted that the 2025 retirement of J.H. Campbell would save ratepayers $150 million in avoidable capital expenditures.[54]

After months of litigation, most of the parties reached a settlement agreement, which Consumers filed with the MPSC on April 20, 2022.[55] The settlement agreement approved the retirement of J.H. Campbell – but it also approved the construction, procurement, and extension of other major generating resources. The net effect of these changes was to substantially increase the total generating resources available to MISO Zone 7.

*iii. Effect of Consumers' overall plan on resource adequacy.*

MISO measures capacity for resource adequacy purposes in zonal resource credits (ZRCs). One ZRC is equal to one MW of deliverable seasonal accredited

---

[52] MPSC Case No. U-21090 (Blumenstock Direct, 3 Tr 99 and 147-49), Attachment H, available at https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/0688y000001OEXnAAO.
[53] *Id.* (Walz Rebuttal, 3 Tr 364-73 & Ex A-123; Blumenstock Rebuttal, 3 Tr 178-79).
[54] MPSC Case No. U-21090, Order approving contested settlement, *supra* n.45.
[55] MPSC Case No. U-21090-0777 (Settlement Agreement), Attachment I, available at https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/0688y000002gLkGAAU.

capacity, which is the net amount of capacity MISO calculates it can reasonably expect from a resource.[56]

Consumers' IRP projected that the entire J.H. Campbell plant would provide 1,346 ZRCs in 2024, its last full year of planned operation.[57] In recognition of the reduced capacity that would result from the retirement of J.H. Campbell, the settlement authorized Consumers to acquire the Covert gas plant, which Consumers has done.[58] At the time, the Covert plant was in the PJM regional transmission organization – but after acquiring it, Consumers redesignated the Covert plant as part of MISO Zone 7.[59] This action added 1,114 ZRCs to Zone 7 – almost enough by itself to offset the ZRCs removed by the Campbell retirement.[60]

The settlement also authorized Consumers to continue operating Units 3 and 4 of the Karn plant – peaking units that burn natural gas and oil – until 2031, rather than retire them in 2023 as originally planned.[61] This action maintained another 784 ZRCs in Zone 7 beyond what was in Consumers' original plan.[62] The settlement agreement also authorized Consumers to develop or acquire 250 ZRCs of new solar generation by mid-2025, increasing to 852 ZRCs by mid-2028; added 94 ZRCs of

---

[56] MISO Knowledge Base, KA-01402, available at https://help.misoenergy.org/knowledgebase/article/KA-01402/en-us#:~:text=Zonal%20Resource%20Credits%20(ZRC)%20are,Seasonal%20Accredited%20Capacity%20(SAC); MISO, Resource Adequacy, available at https://www.misoenergy.org/planning/resource-adequacy2/resource-adequacy/#t=10&p=0&s=FileName&sd=desc.

[57] MPSC Case No. U-21090, Order approving contested settlement, June 23, 2022, p. 33.

[58] *Id.* at 5.

[59] *Id.* at 91.

[60] *Id.* at 50.

[61] *Id.* at 11.

[62] *Id.*

demand response and energy waste reduction by mid-2025; and added 71 ZRCs of new battery storage in 2024-2027.[63] The settlement also provided that Consumers would issue a solicitation for power purchase agreements (PPAs) that would provide capacity beginning in 2025/2026, right after J.H. Campbell's retirement.[64] The PPA solicitation would seek up to 500 MW of dispatchable generation, and up to 200 MW of clean energy resources.[65]

Overall, the plan approved in the settlement was projected to increase Zone 7's capacity by at least 127 ZRCs by June 2025 – an increase that will grow to at least 923 ZRCs by 2028, not including the 700 MW of additional capacity sought in the PPA solicitations.[66]

*iv. MPSC approval of the settlement and affirmance on appeal.*

Consumers' IRP settlement agreement was supported by most parties in the case, including Consumers, Staff, the Attorney General, consumer advocates, a transmission company, commercial and industrial customers, businesses in the advanced energy sector, environmental groups, and third-party energy developers.[67] The MPSC approved the Settlement Agreement on June 23, 2022.[68] The state commission found that the plan embodied in the settlement "is the most reasonable and prudent means of meeting Consumers' energy and capacity needs."[69]

---

[63] *Id.* at 23.
[64] *Id.* at 6-7. In MISO, the planning year runs from June 1 through May 31.
[65] *Id.*
[66] *Id.* at 24.
[67] *Id.* at 30-31.
[68] *Id.* at 87-93.
[69] *Id.* at 95.

In reaching these conclusions, the MPSC specifically addressed resource adequacy.[70] After discussing the record evidence regarding the Covert plant, Karn units 3 and 4, new battery storage, and ongoing investments in solar, energy waste reduction, and demand response,[71] the MPSC concluded that "the approval of the settlement agreement will enhance resource adequacy in Zone 7 in both the near-term and long-term."[72] One party, Wolverine Power Supply Cooperative, appealed the MPSC's decision to approve the Campbell Plant retirement. The Michigan Court of Appeals affirmed the MPSC. The court specifically addressed resource adequacy, quoted the MPSC's findings about the generating resource additions, and found that the state commission's decision was based on substantial evidence.[73]

*v. Subsequent proceedings before the MPSC show that both Consumers' service territory and Michigan as a whole will have sufficient capacity this spring and for years to come.*

Filings in MPSC proceedings regarding capacity supply and resource adequacy demonstrate that there is no capacity shortfall. To the contrary, the most current available information is that both Consumers and MISO Zone 7 will have sufficient capacity this fall and for years to come. In its last capacity demonstration filing to the

---

[70] *Id.* at 90-93.
[71] *Id.*
[72] *Id.* at 92.
[73] Wolverine Power Supply Coop., Inc. v Michigan Public Service Commission (In re Consumers Energy), 2023 Mich. App. LEXIS 2045; 2023 WL 2620437 (March 23, 2023).

MPSC that included public ZRC amounts,[74] Consumers projected a surplus of 35 ZRCs for Planning Year 2025-26, a surplus of 484 ZRCs for PY 2026-27, a surplus of 662 ZRCs for PY 2027-28, and a surplus of 851 ZRCs for PY 2028-29.[75] All of these figures excluded any capacity from J.H. Campbell.[76] Consumers also planned to add 1,027 ZRCs of new generation in the following three years.[77]

Consumers' ZRC projections compare Consumers' available resources not just to projected actual demand but to the planning reserve margin requirement (PRMR). MISO establishes the PRMR as the amount of reserve margin target necessary to meet North American Electric Reliability Corporation's (NERC) Loss of Load Expectation (LOLE) standard of 1 day in 10 years.[78] NERC defines the LOLE as "the expected number of days per year for which the available generation capacity is insufficient to serve the daily peak demand."[79]

The MPSC Staff found in its most recent annual capacity demonstration report: "All LSEs [load serving entities] were able to procure the necessary capacity

---

[74] Consumers' most recent capacity demonstration filing did not include the same detail in public exhibits, but did assert that "this Affidavit is a demonstration to the Commission that the Company has sufficient electric capacity arrangements for Planning Year ("PY") 2029/2030" and that "[t]he Company will plant to mee the Company's PRMR and thus maintain resources to meet full-service customer capacity needs throughout the PY, including during peak load period." Consumers Energy's Capacity Demonstration Filing, February 24, 2026, Affidavit of Anita J. Griffin at pages 2, 5, available at: https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/068cs00001lBTnxAAG.
[75] MPSC Case No. U-21775, Consumers Energy's Capacity Demonstration Filing, February 24, 2025, Ex. 2, available at: https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/068cs00000bz8crAAA, Attachment J.
[76] MPSC Case No. U-21775, MPSC Order, August 21, 2025, p. 19, available at: https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/068cs000016Zd18AAC, Attachment K.
[77] *Id.*, Ex. 5.
[78] MISO Resource Adequacy Business Practices Manual, BPM-011-r31, p. 27, Section 3.4.2 LOLE Analysis, Attachment L.
[79] NERC Probabilistic Assessment Technical Guideline, August 2016, p. 2, Attachment N.

to demonstrate compliance for the current planning year in all four seasons."[80] That Staff Report also found that there are more than enough resources in Zone 7 to meet the MISO Local Clearing Requirement (LCR) – which is the minimum amount of resources that must be located within a MISO local resource zone to meet the reliability standard.[81] While Zone 7 did not have enough internal resources to meet its entire PRMR, it is not required to do so under MISO rules, and the zone is able to import 785.5 ZRCs of external resources to meet its PRMR for the current planning year.[82]

The MPSC also went on record after the Department issued the Campbell I Order that there is no capacity shortfall and no emergency in Consumers' service territory or the broader MISO footprint. In its submittal to FERC in the pending J.H. Campbell cost recovery proceedings, the MPSC has stated it "adamantly disputes that there is, in fact, an energy emergency that warrants the use of the Federal Power Act to keep the Campbell plant open and operational…"[83] The MPSC noted that Consumers has made sufficient plans in its IRP to serve the electricity needs of its customers 5, 10, and 15 years into the future.[84] The MPSC also noted that Consumers has demonstrated in the state capacity demonstration dockets that it has sufficient capacity to meet its obligations every year since those proceedings began in 2017.[85]

---

[80] MPSC Case No. U-21907, Capacity Demonstration Results Report, May 12, 2026, p. 6, Attachment M.
[81] *Id.* at 15.
[82] *Id.*
[83] FERC Docket No. EL25-90, submission of MPSC, June 20, 2025, p. 2, Attachment O.
[84] *Id.* at 5.
[85] *Id.*

The MPSC also provided a host of reasons why MISO has sufficient capacity and no emergency exists in the broader region:

- MISO's planning resource auction results for the upcoming planning year do not indicate any resource adequacy deficiencies in any part of MISO as all local resource zones had more than enough committed resources to meet their LCRs.[86]
- MISO's Independent Market Monitor (IMM) identified an error in the NERC Long-Term Reliability Assessment on which the Department based Order No. 202-25-3, which NERC ultimately acknowledged and corrected – lowering MISO's risk assessment accordingly.[87]
- An IMM staffer explicitly stated the Campbell Plant is not factored into MISO's clearing prices, is not necessary for reliability, and MISO's auction "already returned a better than one-day-in-10-years standard without the large coal plant."[88]

At an MPSC meeting shortly after the Department issued the Campbell I Order, MPSC Chair Dan Scripps said: "We currently produce more energy in Michigan than needed;" and "[t]he unnecessary recent order from the U.S.

---

[86] *Id.* at 7-8, citing MISO Planning Resource Auction Results for Planning Year 2025-26, published April 2025, corrected and reposted May 29, 2025, Slides 18–21, Attachment B.
[87] *Id.*, citing Amanda Durish Cook, MISO IMM Blasts NERC Long-term Assessment, Says RTO in Good RA Spot, RTO INSIDER LLC, June 11, 2025, at p 38, available at /www.rtoinsider.com/107764-miso-imm-blasts-nerc-long-term-assessment/.
[88] *Id.*

Department of Energy will increase the cost of power for homes and businesses in Michigan and across the Midwest."[89]

*vi. MISO approved the retirement of J.H. Campbell after a detailed study process governed by MISO's FERC-approved tariff*

More than three years before the Secretary issued the Campbell I Order, MISO determined through a detailed technical study that retirement of J.H. Campbell would not materially impact reliability in MISO. That determination remains in effect.

Section 38.2.7 of MISO's Open Access Transmission, Energy, and Operating Reserve Markets Tariff requires that the owner of a Generation Resource that is planning to suspend operations of all or a portion of that resource must notify MISO at least 26 weeks in advance by submitting a completed Attachment Y Notice.[90] The Tariff states that MISO will perform an Attachment Y Reliability Study to determine whether the Generation Resource is necessary for the reliability of the Transmission System based on analyses described in the Tariff and criteria in the MISO Business Practices Manuals.[91]

On December 14, 2021, Consumers submitted to MISO an Attachment Y notice of intent to suspend J.H. Campbell Units 1, 2, and 3 effective June 1, 2025.[92] MISO

---

[89] Keith Matheny, *Detroit Free Press,* Trump administration orders Consumers Energy to keep Michigan coal-fired power plant open (May 28, 2025), available at https://www.freep.com/story/news/local/michigan/2025/05/28/trump-consumers-energy-coal-campbell-power-plant-mpsc/83896946007/.
[90] MISO Tariff, Section 38.2.7(a)(i).
[91] MISO Tariff, Section 38.2.7(c).
[92] Attachment C (Letter dated December 14, 2021, from Timothy J. Sparks, Consumers Energy, to Andrew Witmeier, MISO, and Attachment Y Notification of Generating Resources Change of Status).

approved the suspension on March 11, 2022.[93] MISO stated that after reviewing the J.H. Campbell suspension for power system reliability impacts, MISO had determined that "the suspension of Campbell Units 1, 2 & 3 would not result in violations of applicable reliability criteria. Therefore, Campbell Units 1, 2 & 3 may suspend without the need for the generators to be designated as a System Support Resource ('SSR') units as defined in the Tariff."[94]

On May 27, 2025, MISO requested that Consumers submit a modified Attachment Y request with a new suspension start date of August 21, 2025, consistent with the date in the Campbell I Order.[95] Consumers submitted the modified Attachment Y notice with the new date on May 28, 2025.[96] On May 30, 2025, MISO notified Consumers that with the modification, "the Attachment Y remains as is, still approved, except with a new/different start date."[97] On August 21, 2025, Consumers notified MISO of its intent to further modify its Attachment Y notice "such that the Campbell Plant will now suspend on December 3, 2025, to account for the DOE Order period plus a reasonable ramp down period at the close of the DOE Order."[98]

---

[93] Attachment C (Letter dated March 11, 2022, from Andrew Witmeier, MISO, to Timothy J. Sparks, Consumers Energy, re: Approval of Campbell Units 1, 2 & 3 Attachment Y Suspension Notice).
[94] *Id.*
[95] Attachment C (Email dated May 27, 2025, from Huaitao Zhang, MISO, to Kathy Wetzel, Consumers Energy).
[96] Attachment C (Email dated May 28, 2025, from Rachael Moore, Consumers Energy to Huaitao Zhang, MISO).
[97] Attachment C (Email dated May 30, 2025, from Marc Keyser, MISO, to Rachael Moore, Consumers Energy).
[98] Letter from Sri Maddipati, VP Electric Supply. Consumers Energy, to Andrew Witmeier, Director of Resource Utilization, MISO (August 21, 2025), Attachment LL.

### D. The Campbell I Order and Michigan AG's Request for Rehearing.

On May 23, 2025, the Secretary of Energy issued an order pursuant to section 202(c) of the Federal Power Act, determining that an emergency exists in the region of the country served by MISO "due to a shortage of electric energy, a shortage of facilities for the generation of electric energy, and other causes" and ordering Consumers and MISO to ensure the continued operation of J.H. Campbell for at least 90 days notwithstanding the longstanding plan to retire the facility on May 31, 2025.

The Campbell I Order claimed that an "emergency situation" allegedly necessitated invocation of section 202(c). It pointed primarily to "*potential* tight reserve margins during the summer 2025 period," citing to the North American Electric Reliability Corporation (NERC) 2025 Summer Reliability Assessment, including the statement that MISO is "at elevated risk of operational reserve shortfalls during periods of high demand or low resource output."[99] The Campbell I Order then described the retirement of thermal generation capacity including the retirement of approximately 2,700 MW of coal-fired capacity in Michigan since 2020 and the scheduled May 31, 2025, retirement of J.H. Campbell.[100] The Campbell I Order acknowledged Consumers' acquisition of 1,200 MW of replacement natural gas capacity and MISO's April 2025 conclusion that its auction resulted in "demonstrated sufficient capacity,"[101] but did not reference, let alone consider, the extensive processes that MISO and the MPSC undertook to evaluate and mitigate any

---

[99] DOE Order 202-25-3 at 1 (emphasis added).
[100] *Id.* at 1.
[101] *Id.* at 2.

reliability or resource adequacy risk that would be caused by the retirement of J.H. Campbell.[102] Nor did the Campbell I Order describe any actions that MISO or Consumers had taken or could take to mitigate any alleged emergency conditions short of ordering the continued operation of the plant. Rather, the Campbell I Order relied almost exclusively on:

- The general statement in NERC's 2025 Summer Reliability Assessment that there is anticipated to be "elevated risk of operating reserve shortfalls"
- Language in MISO's Planning Resource Auction Results for Planning Year 2025-26 that, "for the northern and central zones, which includes Michigan, 'new capacity additions were insufficient to offset the negative impacts of decreased accreditation, suspensions/retirements and external resources,'" and that the results "reinforce the need to increase capacity" and,
- Language from the MISO Auction Results that the summer months have, relative to other times, the "highest risk and tighter supply-demand balance."[103]

The Campbell I Order concluded that "additional dispatch of the Campbell Plant," for the 90-day duration of the order and on conditions contained in the order, "is necessary to best meet the emergency and serve the public interest."[104] As a result, the Campbell I Order mandated that:

---

[102] *See* Section II.C *supra*.
[103] DOE Order 202-25-3 at 2.
[104] DOE Order 202-25-3 at 2.

- MISO and Consumers Energy take all necessary steps to ensure the Campbell Plant is available for dispatch;[105]
- MISO employ economic dispatch of the plant, and that Consumers comply with all such dispatch orders;[106]
- All operation of J.H. Campbell "must comply with applicable environmental requirements . . . to the maximum extent feasible while operating consistent with the emergency conditions."[107]
- MISO submit reports to DOE on plant operations, environmental impacts, and actions taken to comply with the Order.[108]
- "Relevant governmental authorities" take such action as necessary to enable MISO to effectuate the dispatch and operation of the units.[109]
- Consumers request any necessary revisions or waivers to effectuate the order with FERC.[110]

On June 18, 2025, the Michigan Attorney General filed a request for rehearing with the Department, which demonstrated that the Campbell I Order was legally unsound and factually baseless.[111] On July 24, the Michigan Attorney General petitioned for review of the Campbell I Order in the United States Court of Appeals for the District of Columbia Circuit.[112]

---

[105] *Id.* at 2 (Ordering Paragraph A).
[106] *Id.* (Ordering Paragraph A).
[107] *Id.* at 3 (Ordering Paragraph C).
[108] *Id.* at 3 (Ordering Paragraph B, D).
[109] *Id.* at 3 (Ordering Paragraph E).
[110] *Id.* at 3 (Ordering Paragraph F).
[111] Michigan AG Request for Rehearing (June 18, 2025), Attachment P.
[112] *Michigan v. U.S. Dep't of Energy*, Petition for Review (D.C. Cir. July 24, 2025), Attachment Q.

**E. The July 7 Resource Adequacy Report.**

On July 7, 2025, the Department published "*Resource Adequacy Report: Evaluating the Reliability and Security of the United States Electric Grid"* pursuant to EO 14262.[113] The *Resource Adequacy Report* explained that its purpose was "to evaluate both the current state of resource adequacy as well as future pressures resulting from the combination of announced retirements and large load growth."[114] The *Resource Adequacy Report* acknowledges its required publication under EO 14262 and its intended role in resource adequacy planning: "EO 14262 mandates the development of a uniform methodology for analyzing current and anticipated reserve margins across regions of the bulk power system regulated by the Federal Energy Regulatory Commission (FERC)."[115] DOE plainly stated that one purpose of the *Resource Adequacy Report* is to "guide reliability interventions."[116]

Despite the *Resource Adequacy Report's* ambition to establish a new mechanism of resource adequacy planning, DOE provided no public notice or request for comment on the methods or reliability standards DOE may have considered. The result of that flawed process is a report riddled with errors, including flawed and unexplained assumptions for load growth projections and resource retirements and

---

[113] U.S. Dep't of Energy, Resource Adequacy Report: Evaluating the Reliability and Security of the United States Electric Grid (July 7, 2025), https://www.energy.gov/sites/default/files/2025-07/DOE%20Final%20EO%20Report%20%28FINAL%20JULY%207%29.pdf, Attachment R (RAR)
[114] *Id.* at i.
[115] *Id.* at vi.
[116] *Id.* at vi.

additions.[117] The *Resource Adequacy Report* also does not address actions already being taken by states, utilities, and regional grid operators to meet increased load growth or how markets are already responding to increasing demand.[118] Nevertheless, despite this array of assumptions biased towards identifying resource adequacy shortfalls, the *Resource Adequacy Report* reported that in its model of current system conditions, MISO "did not experience shortfall events."[119] In other words, the Department found that currently there is no resource adequacy shortfall in MISO.

On August 6, 2025, the Michigan Attorney General joined a coalition of other state attorneys general in filing a Motion to Intervene and Request for Rehearing as to the *Resource Adequacy Report*.[120] Specific issues identified in the Multistate Request for Rehearing included that the *Report* is "arbitrary, capricious, contrary to law, and unsupported by substantial evidence in violation of the Administrative

---

[117] The Report itself even admits that it is lacking in information held by "entities responsible for the maintenance and operation of the grid," which "could further enhance the robustness of reliability decisions." *Id.* at i.

[118] *See,* Ric OConnell, *GridLab Analysis: Department of Energy Resource Adequacy Report*, GRIDLAB.ORG, July 11, 2025, accessible at https://gridlab.org/gridlab-analysis-department-of-energy-resource-adequacy-report/ (GridLab explaining in its analysis that: "[m]arkets and utilities have already responded with plans to add new capacity and fast track new resources…. [t]hese include PJM's Reliability Resource Initiative, which plans on adding 11 GW of new firm resources by 2030. SPP and MISO both have proposals at FERC (called ERAS) that could add another 30 GW of firm resources…. [t]hose three regional efforts alone would add roughly twice what the DOE assumed for the entire nation.").

[119] RAR at 20.

[120] *See* Motion to Intervene and Request for Rehearing by the Attorneys General of Maryland, Washington, Minnesota, Michigan, Illinois, Arizona, Colorado, Connecticut, and New York, *In re: Resource Adequacy Report: Evaluating the Reliability and Security of the United States Electric Grid, July 2025*, (the "Multistate Request for Rehearing" or "Multistate Request"), Attachment S. The challenges to the Report raised in that Multistate Request are hereby incorporated by reference in this rehearing request.

Procedure Act and Federal Power Act because it suffers from numerous analytical, mathematical, and empirical flaws" such as those described above and more fully in the Multistate Request.[121] On September 5, 2025, the Department sent a letter to the state attorneys general stating that the Resource Adequacy Report was not an order reviewable under section 313 of the Federal Power Act, but was "simply a report that details the current condition of the United States electrical grid."[122]

**F. The Campbell II Order.**

On August 20, 2025, the Department issued the Campbell II Order. In the nearly ninety days that had passed since the initial Order, DOE had ample time to seek comment as to whether an extension was necessary or conduct other process. It chose not to. Instead, DOE again acted on its own motion, without notice, and on the eve of the Campbell I Order's August 21st expiration.

The Campbell II Order relied both on the summer-specific "emergency" purportedly justifying the original Order as well as new "emergency" conditions "likely to continue" for "*years*".[123]

First, as to the Summer "emergency," the Campbell II Order reasoned that the Campbell Plant will remain necessary "to maintain reliability in MISO this summer."[124] After recounting the flawed basis for the Campbell I Order, as

[121] *Id.* at Section III ("Statement of Issues and Specifications of Errors"). Also on August 6, 2025, the Natural Resources Defense Council, the Ecology Cetner, Environmental Defense Fund, Environmental Law and Policy Center, Public Citizen, Sierra Club, and Vote Solar, filed a Request for Rehearing as to the DOE Report.
[122] Letter of Tina Francone to State Attorneys General (Sept. 5, 2025), Attachment T.
[123] Order No. 202-25-7 at 7 (emphasis added).
[124] *Id.* at 2.

"evidence[]" of that "need," the Campbell II Order pointed to the fact that the Campbell Plant generated 664,000 MWh (gross) in June, that MISO issued various alerts in June, July, and August, and that a NOAA report predicted that Michigan had a 40% chance of higher-than normal temperatures this summer.[125]

Second, the Campbell II Order asserted a general resource adequacy "problem" in MISO supposedly dating as far back as 2022 and as far in the future as 2030.[126] In support, the Campbell II Order catalogued steps MISO has taken to *remedy* resource adequacy concerns. Those include a 2021 filing with FERC seeking authority, which FERC granted over three years ago, to establish resource adequacy requirements throughout the year.[127] The Campbell II Order also pointed to a 2023 MISO study, which predicted that by 2027 there would be a risk of loss of load in the Fall equal to the risk in the Summer—without acknowledging that that same report predicted that the Summer risk would be much lower than it had been in 2023.[128] And, the Campbell II Order noted a 2024 MISO report that identified non-summer resource adequacy concerns, but ignores that same report's discussion of the ways in which MISO has already "shifted from its annual summer-focused resource adequacy construct to a new framework that establishes resource adequacy requirements on a

---

[125] *Id.* at 2-3.
[126] *Id.* at 3-7.
[127] *Id.* at 3; *see Midcontinent Independent System Operator, Inc.,* FERC Docket No. ER22-495-000 (Nov. 30, 2021). This request was approved by FERC on August 31, 2022. Midcontinent Independent System Operator, Inc., 180 FERC ¶ 61,141 (2022).
[128] *See* Campbell II Order at 4; *see Attributes Roadmap*, MISO (Dec. 2023) at 11, https://cdn.misoenergy.org/2023%20Attributes%20Roadmap631174.pdf, Attachment U.

seasonal basis for four distinct seasons."[129] The Campbell II Order also pointed to a report issued on June 6, 2025, by the Organization of MISO States and MISO, which predicted capacity deficits beginning in 2027 and growing through 2030.[130] But the Campbell II Order itself acknowledged that the report identified a *surplus* of capacity in Summer 2026 and that MISO is already taking actions to address the distant, potential resource adequacy deficits.[131] Finally, the Campbell II Order relied on EO 14262 and DOE's *Resource Adequacy Report* to substantiate a general "energy crisis." In discussing the general "energy crisis" and general resource adequacy "problem" stretching across most of a decade, the Order never identifies what role, if any, J.H. Campbell's continued operation over the subsequent 90 days might play in remedying that "crisis" or "problem."

Nevertheless, the Campbell II Order concluded that "continued operation of the Campbell Plant" will "best meet" an emergency that will "continue in the near term" and is "likely to continue in subsequent years." Accordingly, the Campbell II Order mandated that the Campbell Plant "remain in operation until November 19, 2025."[132] It further ordered that:

---

[129] MISO's Response to the Reliability Imperative, MISO (Updated Feb. 2024), https://cdn.misoenergy.org/2024+Reliability+Imperative+report+Feb.+21+Final504018.pdf, Attachment V; *see* Campbell II Order at 4.

[130] Campbell II Order at 4-5; *see 2025 OMS-MISO Survey Results*, OMS and MISO (Updated June 6, 2025), Attachment W.

[131] Campbell II Order at 5 (citing M*idcontinent Independent System Operator, Inc.,* 192 FERC ¶ 61,064 (2025) (approving MISO's proposed ERAS process)).

[132] *Id.* at 7.

- MISO and Consumers Energy "take all measures necessary to ensure that the Campbell Plant is available to operate."[133]
- MISO "take every step to employ economic dispatch of the Campbell Plant to minimize cost to ratepayers."[134]
- Operation of the Campbell Plant "must comply with applicable environmental requirements, . . . to the maximum extent feasible while operating consistent with the emergency conditions."[135]
- MISO submit reports to DOE on plant operations, environmental impacts, and actions taken to comply with the Order.[136]
- Consumers request any necessary revisions or waivers to effectuate the order with FERC.[137]
- The Campbell Plant "shall not be considered a capacity resource."[138]

### G. The September 8 Rehearing Order.

On September 8, 2025, DOE issued an Order (the Campbell I Rehearing Order) addressing arguments raised by Michigan and other parties in their respective requests for rehearing of the Campbell I Order.[139] Although DOE had previously denied rehearing of the Campbell I Order by operation of law—i.e., by declining to respond—the Campbell I Rehearing Order provided some responses to the arguments presented in parties' previous requests for rehearing, retroactively "modified" the Campbell I Order in limited respect, and otherwise "sustained" the "result" of the

---

[133] *Id.* at 8 (Ordering Paragraph A)
[134] *Id.*
[135] *Id.* (Ordering Paragraph C).
[136] Id. (Ordering Paragraph D).
[137] *Id.* (Ordering Paragraph E).
[138] *Id.* (Ordering Paragraph G).
[139] DOE Order No. 202-25-3B (Sept. 8, 2025) (Campbell I Rehearing Order).

Campbell I Order.[140] The Campbell I Rehearing Order also granted Michigan's motion to intervene, but purported to "take no position" as to whether Michigan is an "aggrieved" party under Section 313 of the Federal Power Act.[141]

**H. The Campbell III Order.**

On November 18, 2025, DOE issued a third 202(c) Order as to the Campbell Plant. The Order extended the compelled operation of Campbell from November 19, 2025, to February 17, 2026. Once again, DOE had ample time to seek comment as to whether an extension was necessary or conduct other process. It chose not to. Instead, DOE again acted on its own motion, without notice, and on the eve of the Campbell II Order's November 19th expiration.

The Campbell III Order begins by asserting that the "emergency conditions that led to the issuance of" Campbell I and Campbell II "continue, both in the near and long term."[142] The Order was a nearly verbatim copy of Campbell II, with one exception. With respect to NERC's assessment, the Order stated:

> While the 2025 –2026 NERC Winter Reliability Assessment has not yet been released as of the date of this Order, two recent winter studies (2024 –2025 NERC Winter Reliability Assessment and the 2023 –2024 NERC Winter Reliability Assessment) have assessed the MISO assessment area as an elevated risk, with the "potential for insufficient operating reserves in above-normal conditions." Specifically, the 2024 –2025 Winter Reliability Assessment noted that "[ge]nerating capacity is 10 GW lower (-6.8%) compared to the prior winter as generators have retired, withdrawn from MISO's capacity market, or received lower winter accredited capacity." (footnotes omitted).

---

[140] *See* Campbell I Rehearing Order at p. 24.
[141] Campbell I Rehearing Order at 23-24; *see* 16 U.S.C. § 825*l*.
[142] Campbell III Order at 3.

On November 19, 2025, the day after the Campbell III Order was issued, the Michigan AG filed a motion for stay in which she observed that the 2025/2026 NERC Winter Reliability Assessment had been issued prior to the Order and that it identified MISO as a "normal risk" for the upcoming winter, the lowest category of risk designation. The motion requested that DOE immediately stay the Campbell III order and correct its error." As of this date, the Department has neither stayed the Campbell III order or acknowledged its error.

**I. The Campbell IV Order.**

On February 18, 2026, DOE issued its fourth Order as to the Campbell Plant; the timing of the order inexplicably left the plant outside of the previous order period (expiring February 17, 2026) for part of a day before this Order was issued. The Order extended the compelled operation of Campbell from February 17, 2026, to May 18, 2026. Once again, DOE had ample time to seek comment as to whether an extension was necessary or conduct other process. It chose not to. Instead, DOE again acted on its own motion, without notice, and on the day following the Campbell III Order's February 17th expiration.

The Order began by asserting that the "emergency conditions that led to the issuance of" Campbell I, Campbell II, and Campbell III "continue, both in the near and long term."[143] The Order was mostly verbatim copy of the prior Campbell Orders, with minor exceptions, including that:

---

143 Campbell IV Order at 3.

- The Order finally acknowledged that the 2025/2026 NERC Winter Reliability Assessment identified only "normal risk," the lowest category of risk designation, for 2026, though it then incorrectly stated without explanation or reference that the assessment shows "elevated risk in 2027."[144]
- The Order included statements as to NERC's January 2026 Long-Term Reliability Assessment,[145] though it ignored crucial MISO-specific information in the assessment and further failed to explain how, even as referenced, the assessment might have demonstrated an emergency for the period of the Order.
- The Order included references to Winter Storm Fern,[146] but failed to explain how any operation or non-operation of Campbell was pertinent to the storm or how any facts related to the storm might have demonstrated an emergency for the period of the Order.

### J. The Campbell V Order

On May 19, 2026, DOE issued its fifth Order as to the Campbell Plant; the timing of the order, once again, inexplicably left the plant outside of the previous order period (expiring May 18, 2026) for part of a day before this Order was issued. The Order extended the compelled operation of Campbell from May 19, 2026, to August 16, 2026. Once again, DOE had ample time to seek comment as to whether an extension was necessary or conduct other process. It chose not to. Instead, DOE

---

[144] *Id.* at 5.
[145] *Id.*
[146] *Id.* at 6.

again acted on its own motion, without notice, and on the day following the Campbell IV Order's May 18th expiration.

The Order began by asserting that the "emergency conditions that necessitated the issuance of" Campbell I, Campbell II, Campbell III, and Campbell IV "continue, both in the near and long term."[147] The Order was, once again, mostly verbatim copy of the prior Campbell Orders, with minor exceptions, including:

- The inclusion of dates and timelines relevant to the previous (4th) order,
- The update of the approximate MWh/month generated by the Campbell plant, and
- A new clause that stated: "This Order does not provide relief from any obligation to pay fees, or purchase offsets or allowances for emissions that occur during the emergency conditions, or to use other geographic or temporal flexibilities available to generators."

These minor changes simply updated the document to be timely, rather than contributing more substance or information.

**K. The Campbell VI Order**

On August 14, 2026, DOE issued its sixth Order as to the Campbell Plant. The Order extends the compelled operation of Campbell from August 17, 2026, to November 14, 2026. Once again, DOE had ample time to seek comment as to whether an extension was necessary or conduct other process. It chose not to. Instead, DOE again acted on its own motion and without notice.

[147] Campbell V Order at 3.

The Order begins by asserting that the "emergency conditions that necessitated the issuance of" Campbell I, Campbell II, Campbell III, Campbell IV, and Campbell V "continue, both in the near and long term."[148] The Order is, once again, mostly verbatim copy of the prior Campbell Orders, with a few additions, including:

- The inclusion of dates and timelines relevant to the previous (5th) order,
- The update of the approximate MWh/month generated by the Campbell plant, and
- A focus on data centers/large loads: The 2026 OMS-MISO Survey projects adequacy for the summer of 2026 and subsequent years.[149] However, this Order claims uncertainty and evolving risk of large load additions and "projected capacity scenarios."
- NERC's 2026 State of Reliability (SOR), released on June 24, 2026[150] that describes perceived issues of large-load integration and local operations.

These changes unsuccessfully attempt to bolster the flawed arguments from the prior Orders.

---

[148] Campbell VI Order at 3.
[149] OMS & MISO, OMS-MISO Survey Results (updated June 4, 2026) (2026 OMS-MISO Survey), https://cdn.misoenergy.org/20260604%20OMS-MISO%20Survey%20Results%20Workshop%20Presentation761711.pdf.
[150] NERC, 2026 State of Reliability: Tech. Assessment of 2025 Bulk Power Sys. Performance, at 5 (June 24, 2026), https://www.nerc.com/globalassets/programs/rapa/pa/nerc_sor_2026_technical_assessment.pdf.

## III. STATEMENT OF ISSUES AND SPECIFICATIONS OF ERROR

As explained in Section IV below, the Michigan Department of Attorney General submits the following statement of issues and specifications of error:

1. The Order is contrary to law because it fails to establish the existence of an emergency under section 202(c) or the Department's regulations implementing section 202(c), and fails to provide substantial evidence to support its emergency finding. The statutory text, legislative history, judicial construction and DOE's regulations all confirm that an "emergency" is an occurrence that is sudden, unexpected and requiring immediate action. The Order introduces no facts that would satisfy that definition. 16 U.S.C. § 824a(c); 10 C.F.R. § 205.371; *Richmond Power and Light v. FERC*, 574 F.2d 610, 615 (D.C. Cir. 1978); *Otter Tail Power Co. v. Fed. Power Comm.*, 429 F.2d 232, 233-34 (1970).

2. The Order is contrary to law because it exceeds the Department's statutory authority. Abusing a statute meant only for emergencies, the Order intrudes on authority reserved to States and to other federal regulators to regulate resource adequacy. Section 202(c) does not vest DOE with general regulatory authority over resource adequacy, or the authority to decide which power plants may retire except for so long as a true emergency exists. The Department may not "discover in a long-extant statute an unheralded power representing a transformative expansion in its regulatory authority." *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 724–25, (2022) (quoting *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014)) (internal quotations omitted).

3. The Order fails to present substantial evidence for its emergency determination and fails to exercise reasoned decision-making by ignoring critical facts and shortcomings in its analysis. Specifically, the Order: (i) continues to misrepresent NERC Reliability Assessments, (ii) continues to misrepresent MISO reports and documents, (iii) fails to identify any evidence or exhibit any reasoning surrounding the events of Winter Storm Fern that might support a determination of an "emergency" during the period of the Order, (iv) ignores key information from NERC's most recent Long-Term Reliability Assessment that indicates there will not be an emergency in MISO during the period of the Order or otherwise within the scope of the assessment, (v) fails to explain or acknowledge that the *Resource Adequacy Report* (itself procedurally, methodologically, and substantively flawed) flatly contradicts the Order's emergency finding; (vi) fails to acknowledge that MISO approved the retirement of J.H. Campbell through the study process governed by its FERC-approved tariff; (vii) makes no effort to review the proceedings before the MPSC, or to note any consultation with Michigan officials as required by 42 U.S.C. § 7113; and (viii) fails to provide any specific evidence or reasoning why J.H. Campbell must remain in operation, why alternative measures are

inadequate, and generally why avoiding retirement of the Campbell Plant would "best meet the emergency and serve the public interest." *See*, *e.g.*, 16 U.S.C. § 824a(c); 10 C.F.R. § 205.373; 16 U.S.C. § 824*l*(b) (factual assertions in orders under the Federal Power Act must be supported by substantial evidence); *E.g. Emera Maine v. FERC*, 854 F.3d 9, 22 (D.C. Cir. 2017) (order under the Federal Power Act must reflect "a principled and reasoned decision supported by the evidentiary record" (quotation marks omitted)); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) (an "agency must make findings that support its decision, and those findings must be supported by substantial evidence").

4. The Order is contrary to law because section 202(c) provides no authority for the Department to command a generator to engage in "economic dispatch," 16 U.S.C. § 824a(c); *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001) (absent statutory authorization, an agency's "action is plainly contrary to law and cannot stand"), and arbitrary and capricious because, even if the Department had such authority, it provides no reasoned basis for commanding "economic dispatch" as necessary to "best meet the emergency and serve the public interest." 16 U.S.C. § 824a(c); 5 U.S.C. § 706(2).

5. The Order is arbitrary and capricious and contrary to law because the Department failed to limit its remedy as required by section 202(c)(2). The Order fails to adhere to the temporal constraint, the environmental constraints, and the renewal procedural requirements imposed by section 202(c)(2). 16 U.S.C. § 824a(c)(2), (4)(B); 5 U.S.C. § 706(2).

6. The Order violates the National Environmental Policy Act (NEPA) because it fails to assess the environmental consequences of a major federal action significantly affecting the human environment. 42 U.S.C. § 4321; *et seq.*

## IV. REQUEST FOR REHEARING

### A. The Department Has Failed to Establish the Existence of an Emergency under Section 202(c) or the Department's Regulations Implementing Section 202(c).

#### *i. Congress limited DOE's authority under section 202(c) to the unique circumstances of war or emergency*

Section 202(c) confers an extraordinary power. Enacted in 1935, section 202(c) empowered the Federal Power Commission to command action from market

participants and—crucially—to do so freed from most of the core procedural safeguards, jurisdictional boundaries, and substantive limitations that underlie the rest of the Federal Power Act. While the rest of the Act authorizes action only after opportunity for hearing,[151] section 202(c) allows the Federal Power Commission (now the Department) to act on its own motion and without prior notice. And in profound contrast to the rest the Federal Power Act and general principles of utility law,[152] section 202(c) empowers the Department to require utilities to incur costs—through a command to provide generation or transmission service—without first considering the impact to ratepayers or whether the resulting rates will be just and reasonable.

It comes as no surprise, therefore, that when Congress granted the Commission this extraordinary power, Congress restricted its use to extraordinary circumstances. Section 202(c) authorizes action only "[d]uring the continuance of any war in which the United States is engaged, or whenever the Commission determines that an emergency exists by reason of a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation or transmission of electric energy, or of fuel or water for generating facilities, or other

---

[151] *See e.g.*, 16 U.S.C. §§ 824a(b), 824a(e), 824a-1(a), 824a-3(f), 824a-4, 824b(a)(4), 824c(b), 824d, 824e, 824f, 824i(b), 824j, 824j-1, 824k, 824m, 824o & 824p.

[152] Two cornerstones of the law of regulated utilities are the filed rate doctrine and the rule against retroactive ratemaking. As FERC has explained, "a central purpose of the filed rate doctrine and the rule against retroactive ratemaking is to protect ratepayers from being subjected to an additional surcharge above the rate on file for service already performed." *Old Dominion Elec. Coop.*, 154 FERC ¶ 61,155 (2016). In its June 6, 2025, complaint filed in FERC Docket No. EL25-90, Consumers asserted that the filed rate doctrine and the rule against retroactive ratemaking are inapplicable in the context of an order under section 202(c). *Consumers Energy v. MISO*, 192 FERC ¶ 61,158 at P 14; *see* Attachment X. The Commission granted Consumers' petition, enabling retroactive rates to recover the costs of the Campbell I Order. *Id.* at P 35.

causes." The Act permits some measure of flexibility with respect to what type of events may cause the emergency, allowing for "other causes" beyond those enumerated, and affords the Secretary a measure of discretion in his evaluation of what constitutes an "emergency." 16 U.S.C. § 824a(c)(1). But the Act is clear that any such event, including a "shortage of electric energy," must be one that constitutes an "emergency," a determination that may extend only to such "emergencies" as fall within the meaning of that term using the traditional tools of statutory interpretation.[153] That the statute directs the Secretary to determine how "best" to meet such an "emergency" in his "judgment" "is not a roving license to ignore the statutory text. It is but a direction to exercise discretion within defined statutory limits."[154]

Because the Act does not define "emergency," the Department must look first to the public meaning of that word at the time of enactment.[155] Webster's New International Dictionary of the English Language (1930) defined "emergency" as a "sudden or unexpected appearance or occurrence . . . . An unforeseen occurrence or combination of circumstances which calls for immediate action or remedy; pressing necessity; exigency." Contemporary dictionaries likewise define "emergency" to refer

---

[153] *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395, 401 (2024) (role of court is always to "interpret the statute and effectuate the will of Congress, including when the statute "delegates discretionary authority to an agency")

[154] *Massachusetts v. EPA*, 549 U.S. 497, 533 (2007).

[155] *See Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 654 (2020); *id.* at 657-58 (relying on dictionary definitions contemporaneous with statutory enactment to determine public meaning).

to a circumstance that is “unexpectedly arising, and urgently demanding immediate attention.”[156]

These definitions accord with the legislative history of the Federal Power Act, which characterized section 202(c) as a temporary authority to be used in response to “crises”:

> This is a temporary power designed to avoid a repetition of the conditions during the last war, when a serious power shortage arose. Drought and other natural emergencies have created similar crises in certain sections of the country; such conditions should find a federal agency ready to do all that can be done in order to prevent a break-down in electric supply.[157]

The few courts that have had occasion to opine on the meaning of “emergency” in section 202(c) have likewise emphasized that the provision applies in very limited circumstances, and not as a tool to address longer-term, structural concerns. In *Richmond Power and Light v. FERC*, the D.C. Circuit upheld the Federal Power Commission’s judgment that, after the immediate aftermath of the 1973 oil embargo had ended, the lingering need for additional electricity to address the Nation’s pressing but longer-term dependence on foreign oil—the dominant feature of national energy policy at the time—was not an “emergency” under the Act, noting that section 202(c) “speaks of ‘temporary’ emergencies, epitomized by wartime disturbances.”[158]

---

[156] *See Acuity Ins. Co. v. McDonald's Towing & Rescue, Inc.,* 747 F. App'x 377, 380–81 (6th Cir. 2018) (addressing a statute that leaves “emergency” undefined and quoting 7 Oxford English Dictionary 231 (2012) among others to supply a definition).
[157] S. Rep. No. 74-621 at 49 (1935).
[158] 574 F.2d 610, 615 (D.C. Cir. 1978).

In *Otter Tail Power Co. v. Fed. Power Comm'n,* the U.S. Court of Appeals for the Eighth Circuit described section 202(c) as enabling the Commission to "react to a war or national disaster."[159] The court also distinguished section 202(c) from section 202(b), under which the Commission may also order interconnections, but only after a hearing. The court explained that, whereas section 202(b) "applies to a crisis which is likely to develop in the foreseeable future but which does not necessitate immediate action on the part of the Commission," section 202(c) "enables the Commission to proceed without notice or hearing" to address immediate crises.[160]

Through its regulations, the Department has also interpreted "emergency" for purposes of section 202(c) to mean circumstances that arise suddenly and unexpectedly:

> "Emergency," as used herein, is defined as an unexpected inadequate supply of electric energy which may result from the unexpected outage or breakdown of facilities for the generation, transmission or distribution of electric power. Such events may be the result of weather conditions, acts of God, or unforeseen occurrences not reasonably within the power of the affected "entity" to prevent. An emergency also can result from a sudden increase in customer demand, an inability to obtain adequate amounts of the necessary fuels to generate electricity, or a regulatory action which prohibits the use of certain electric power supply facilities.[161]

In the Campbell I Rehearing Order, DOE claimed to be unconstrained by the definition of emergency in its own regulations.[162] "It is 'axiomatic,' however, 'that an

---

[159] 429 F.2d 232, 234 (8th Cir. 1970).
[160] *Id.*
[161] 10 C.F.R. § 205.371.
[162] *See* Rehearing Order ¶ 21.

agency is bound by its own regulations.'"[163] "Although it is within the power of [an] agency to amend or repeal its own regulations, [an] agency is not free to ignore or violate its regulations while they remain in effect."[164] DOE was required to adhere to its own definition of "emergency" here.

While the regulations contemplate that "[e]xtended periods of insufficient power supply as a result of inadequate planning or the failure to construct necessary facilities" may be relevant, the regulation merely acknowledges that such circumstances *"can result in* an emergency as contemplated in these regulations."[165] They do not constitute an emergency themselves, in part because the regulations are clear that an emergency must be "*unexpected.*"[166] In fact, the Department addressed this very issue when promulgating the regulations in 1981 and made clear that the definition was *not* intended to be used as a substitute for long-term planning: "The DOE does not intend these regulations to replace prudent utility planning and system expansion."[167] That is why the Department specifically clarified the definition of "emergency" "to indicate that, while a utility may rely upon these regulations for assistance during a period of *unexpected* inadequate supply of electricity, it must solve long-term problems itself."[168]

---

[163] *Nat'l Env't Dev. Assoc.'s Clean Air Project v. E.P.A.*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (quoting *Panhandle Eastern Pipe Line Co. v. FERC,* 613 F.2d 1120, 1135 (D.C. Cir. 1979) (holding that an agency does not have authority to "play fast and loose with its own regulations")).
[164] *Id.* (quoting *U.S. Lines, Inc. v. Fed. Mar. Comm'n,* 584 F.2d 519, 526 n. 20 (D.C. Cir. 1978)).
[165] 10 C.F.R. § 205.371.
[166] *Id.* (emphasis added)
[167] Dep't of Energy, Emergency Interconnection of Electric Facilities and the Transfer of Electricity to Alleviate an Emergency Shortage of Electric Power, 46 Fed. Reg. 39,984, 39,985 (Aug. 6, 1981).
[168] *Id.* (emphasis added).

In summary, the plain meaning of the statutory text, its legislative history, judicial construction, and the Department's own regulations all establish that an "emergency," including one occasioned by a "shortage of electric energy," must be sudden, unexpected, and demanding of "immediate action."

*ii. The Order fails to present facts establishing an emergency under section 202(c) or the Department's regulations*

Even if they were supported by any evidence, the factual assertions made in the Order fail to describe an "emergency." To begin, the Order does not claim that the retirement of J.H. Campbell was sudden or unexpected. Nor could it. The retirement of J.H. Campbell was carefully planned over a period of years and was approved by the MPSC through a public proceeding. Further, Consumers' plan to retire J.H. Campbell included a commitment to procure replacement resources that improved its capacity position. And Consumers' proposal to retire J.H. Campbell was approved in advance by MISO after a thorough review of its impact on reliability.

Nothing in the Order demonstrates any condition that is sudden, unexpected, or demanding of immediate attention. From pages 2 to 10, the Order propounds a scattershot of arguments comprised of recycled text from the first five Campbell Orders and new arguments that attempt but fail to bolster the dubious claim of an emergency.

In addition, it is ambiguous from the face of the Campbell VI Order whether the Department intends to continue to rely on the rationales it put forward in support of the Campbell I Order, and repeated in the Campbell II, Campbell III, Campbell

IV, and Campbell V Orders.[169] If the Department does intend to so rely, the responses and rebuttals that were presented in the Michigan Attorney General's June 18 Request for Rehearing of the Campbell I Order (and reiterated in her Requests for Rehearing of the Campbell II, Campbell III, Campbell IV, and Campbell V Orders), make clear that these rationales fail to support a proper emergency determination under section 202(c)—and, that they fail to provide substantial evidence for the Department's conclusions—and are hereby incorporated by reference.[170]

*a. NERC Winter Reliability Assessments.*

The Department further continues, as in prior Campbell orders, to misrepresent the significance of past NERC winter assessments.[171] While the Campbell VI Order acknowledges a "normal risk" designation for MISO, it incorrectly states without reference or explanation that the assessment included an "elevated risk" determination for 2027.[172] No such determination is included in the assessment. And even if it were, a risk determination for 2027 could not serve as substantial evidence to determine a sudden and unexpected emergency for the period of the new Order, which runs from August 17, 2026 through November 14, 2026. The Order's preoccupation with prior winter assessments is misplaced for the same reason, [173] and

---

[169] Campbell VI Order at 1-3 (summarizing the reasoning in Order No. 202-25-3 and stating that "the emergency conditions that necessitated the issuance of Order Nos. 202-25-3, 202-25-7,202-25-9, 202-26-16, and 202-26-22 continue, both in the near and long term").
[170] Michigan AG Request for Rehearing (June 18, 2025), *supra* n. 113, at 23-32.
[171] The Attorney General incorporates by reference here the arguments she raised in her December 17, 2025, Request for Rehearing concerning the Campbell III Order's discussion of the winter assessment (see at 45-47).
[172] Campbell VI Order at 5.
[173] *Id.* at 5 – 6 (discussing the 2023-2024 and 2024-2025 winter assessments).

ignores the statement in the 2025/2026 assessment that "[t]he MISO Risk Scenario Assessment for the 2025-26 Winter Season is not directly comparable to that for the 2024-25 Winter Season as methodology improvements have been implemented."[174]

*b. NERC 2025 and 2026 Summer Reliability Assessments.*

The Order cites the North American Electric Reliability Corporation's (NERC's) 2025 Summer Reliability Assessment (SRA) as stating that "MISO is at elevated risk of operating reserve shortfalls during periods of high demand and low resource output;" and that retirement of thermal generation capacity has increased the likelihood of electricity supply shortfalls.[175] The Order also cites NERC's 2026 SRA that finds "MISO's peak load has increased by 2.5 GW" from the 2025 SRA.[176] The Order also cites the 2026 assessment's projection that data center load will continue to accelerate in 2027 and beyond and that "[a]bove-normal summer peak load combined with low resource conditions could result in the need to employ operating mitigations" and Energy Emergency Alerts.[177]

To the contrary, NERC's 2026 SRA demonstrates that no emergency was anticipated this summer and that MISO's capacity position has improved.[178] NERC's 2026 SRA designates MISO at normal risk, defined as "sufficient operating reserves expected."[179] NERC projects that MISO will have positive reserve margins in all

---

[174] NERC 2025/2026 Winter Reliability Assessment at 17 (accessible at https://www.nerc.com/globalassets/our-work/assessments/nerc_wra_2025.pdf).
[175] Campbell VI Order at 2, citing NERC, 2026 Summer Reliability Assessment (May 2026), Attachment OO.
[176] *Id.* at 6.
[177] *Id.* at 6.
[178] NERC, 2026 Summer Reliability Assessment (May 2026), Attachment OO.
[179] *Id.* at 3.

scenarios, including typical outage conditions and even in a scenario with higher demand, outages, and derates in extreme conditions.[180] NERC notes that the Campbell plant and other plants and units subject to 202(c) orders are not incorporated into the anticipated resources used to make these projections.[181]

*c. Generating facility retirements.*

Next the Order cites EIA statistics for retirement of coal plants nationally since 2020, one nuclear plant retirement in Michigan (Big Rock), and one nuclear plant in Michigan that retired temporarily but is scheduled to return to service this year (Palisades).[182] This discussion ignores several key facts:

- The statistic about national coal plant retirements demonstrates nothing about reliability in Michigan or the broader MISO Central Region. As discussed above, retirement of the Campbell Plant resulted from a deliberative, consensus process before the Michigan Public Service Commission that identified replacement resources and was approved by MISO after careful study.
- The Big Rock plant was a relatively small nuclear plant with a capacity of just 67 MW. It retired in 1997. The Order never comes close to explaining how the retirement of a mere 67 MW of capacity a decade ago could possibly

---

[180] *Id.* at 10.
[181] *Id.* at 9.
[182] Campbell VI Order at 2.

contribute to the need to operate a 1,400 MW coal plant on an emergency basis today.

- As the Order acknowledges, Palisades is in the process of coming back online this year, which will only bolster resource adequacy in Michigan and the broader MISO region.

*d. MISO 2026-27 Planning Reserve Auction.*

Next the Order asserts that MISO's Planning Resource Auction (PRA) Results for the 2026–2027 Planning Year note that "capacity additions need to continue, given expected growth from new large loads;" and also cites MISO's statement that "while our market reforms have helped hold the line amidst tighter reserve margin compared to the prior decade, resource adequacy remains at risk, especially as demand for large load additions accelerate."[183]

To the contrary, MISO reports in the PRA results for Planning Year 2026-2027 that "all zones show sufficient resources at the regional, subregional, and zonal levels to meet resource adequacy requirements across all four seasons."[184] MISO further reports:

- "Capacity offered into the auction increased by as much as 4% compared to last year's PRA."[185]

---

[183] Campbell VI Order at 2; see also, Campbell VI Order at 6.
[184] MISO, Planning Resource Auction, Results for Planning Year 2026/27 (April 2026, Slides # 14-30 updated May 22, 2026) at 2, Attachment PP.
[185] *Id.*

- "More capacity was offered than last year, which offset higher demand and improved reliability across seasons."[186]
- "New capacity and more imports outweighed lower accreditation and retirements/suspensions."[187]

*e. Campbell Plant Generation.*

Next the Order states that "the total net generation for the Campbell Plant was 1,431,336 MWh from January 2026 to May 2026 for an average of 286,267 MWh per month."[188] This generation total in no way indicates an emergency circumstance. Multiplying the Campbell Plant's 1,420 MW capacity reported in the Order by an average of 30 days per month and 24 hours per day, then dividing that product by the average of 286,267 MWh, results in an average capacity factor of only 28% for the period in question. That low capacity factor demonstrates that Campbell, which was designed to be a base load plant, is operating as a marginal, uneconomic resource.

Further, the Campbell Orders, unlike past 202(c) orders, have not limited the Campbell Plant's dispatch to emergency circumstances or when called upon by MISO.[189] Rather, they have directed MISO to employ economic dispatch of the Campbell Plant.[190] As explained below, dispatching the plant on an economic basis (after it is committed "must run") is expected to result in significantly more frequent operation than what would be required merely to respond to discrete supply shortages

---

[186] *Id.* at 3.
[187] *Id.*
[188] Campbell VI Order at 3.
[189] *Id.* at 11. *See also*, Michigan AG First Rehearing Request at 44-51.
[190] *Id.*

or meet emergency needs. In other words, the simple fact that the Campbell Plant dispatched during this period, as DOE required it to do, in no way indicates an emergency circumstance.

*f. MISO alerts.*

Next the Order states "from June 11, 2025, through November 5, 2025, MISO issued dozens of alerts to manage reliability in its Central Region."[191] But the Order never explains what those alerts meant or why they could possibly provide evidence of an emergency in the fall of 2026. To the extent the Order intended to incorporate arguments related to these alerts as raised in prior Campbell Orders, the Michigan Attorney General incorporates by reference the arguments it made in her rehearing requests on those Orders.[192]

*g. Winter Storm Fern.*

Next the Order states that "MISO's resource adequacy concerns were recently demonstrated during Winter Storm Fern, when it operated under a cold weather alert and declared conservative operations from January 23 through February 1, 2026" – including the declaration of EEAs on January 24, 2026."[193] However, the Order fails to provide any explanation as to how operations during that period might demonstrate an emergency existing during the fall season covered by the Campbell VI Order. To the contrary, NERC's most recent winter assessment noted that for the

---

[191] *Id.* at 3-4.
[192] *See, e.g.,* Michigan AG First Rehearing Request at 44-51.
[193] Campbell VI Order at 4.

purpose of resource adequacy planning "extreme cold weather outage adders were added to the LOLE model to make sure that winter storm risks are included in planning."[194] The Order likewise fails to provide any detail as to how Campbell operated during the storm, or if it even was operational during that period.

*h. MISO Seasonal Resource Adequacy Construct.*

Next the Order notes that starting in 2021, MISO began regulating resource adequacy seasonally.[195] This fact merely illustrates that MISO has rules in place to ensure resource adequacy in all four seasons. It does not mean that capacity shortfalls are likely in any one of those seasons. And it certainly does not establish that emergency conditions will arise in MISO this fall.

*i. MISO Attributes Roadmap and Response to the Reliability Imperative.*

Next the Order points to MISO's publication of its "Attributes Roadmap" for the proposition that "it is expected that by the summer of 2027, there will be an equal loss of load risk in both the summer and fall seasons."[196] However, the Order fails to acknowledge that MISO projects loss of load risk will *decrease* in summer.[197]

It is of course true that MISO has made statements to the effect that there are reliability risks in all four seasons of the year and has implemented programs to address those risks. The same is true of the Order's reliance on MISO's 2024 report

[194] NERC 2025/2026 Winter Reliability Assessment at 52 (accessible at https://www.nerc.com/globalassets/our-work/assessments/nerc_wra_2025.pdf).
[195] Campbell VI Order at 4.
[196] Campbell VI Order at 4.
[197] *Attributes Roadmap*, MISO (Dec. 2023) at 11, Attachment U.

entitled "*MISO's Response to the Reliability Imperative.*"[198] These statements and programs simply illustrate that MISO is doing its job, not that MISO takes the view that there is an emergency now or that there will be an emergency in the period covered by the Order.

MISO's Summer 2026 Seasonal Readiness presentation – also published before the fifth Order – further demonstrates the lack of an emergency in MISO and the Department's arbitrary and capricious disregard of readily available information that rebuts the Department's spurious narrative.[199] MISO reported that 4,451.5 Zonal Resource Credits cleared beyond the 1-in-10 Loss of Load Expectation Requirement.[200] MISO also reported a surplus of generation resources systemwide compared to the coincident peak demand forecast for all three months covered by the fifth Order – and that is before counting load modifying resources.[201] MISO attributed its positive summer position to the fact that "New capacity additions outpaced decreased accreditation and suspensions/retirements."[202] Indeed, despite its apparent

---

[198] Campbell VI Order at 4; MISO's Response to the Reliability Imperative, MISO (Updated Feb. 2024), Attachment V.
[203] MISO, Seasonal Readiness Workshop: Summer 2026 (May 6, 2026), Attachment QQ.
[200] *Id.* at 19.
[201] *Id.* at 20.
[202] *Id.* at 21.

reliance on MISO's programs and selectively-quoted statements of its leaders,[203] the Order once again has failed to acknowledge that MISO itself approved the retirement of the Campbell Plant in 2022 and renewed that determination this last Spring. MISO has not requested this order as necessary.

*j. NERC 2025 Long-Term Reliability Assessment.*

Next the Order misconstrues NERC's 2025 Long-Term Reliability Assessment (LTRA) and ignores more recent contrary information from NERC.[204] As a starting point, the LTRA categorizes MISO as "normal" risk—the lowest risk designation—for 2026, and only "elevated" risk in 2027.[205] Further, the Order's description of the LTRA's long-term MISO forecasts omits reference to the large amounts of resources planned to be added in MISO pursuant to the "recently approved Expedited Resource Addition Study (ERAS) process" that "is expected to result in additional resources in the MISO system beginning in 2028 that are not included in the model for the 2025

---

[203] The Campbell VI Order quotes at length the testimony of Jennifer Curran before the House Committee on Energy and Finance. Ms. Curran's general description of "resource adequacy and reliability challenges" falls far short of claiming that there is or will be an emergency circumstance during the period of this Order or ever. At the same time, the Order ignores much more straightforward statements by MISO officials, such as those of Todd Ramey, MISO, Senior Vice President of Markets and Digital Strategy, who stated at a May 2025 FERC Technical Conference on Resource Adequacy that "We are confident that the [MISO] footprint will continue to be resource adequate in the near and longer term." See FERC Docket No. AD24-11-000, available at https://www.ferc.gov/media/toddramey-miso-senior-vice-president-markets-and-digital-strategy, Attachment BB.

[204] Campbell VI Order at 5.

[205] *See, e.g.*, NERC 2025 Long-Term Reliability Assessment (January 2026) at 8 (accessible at https://www.nerc.com/globalassets/our-work/assessments/nerc_ltra_2025.pdf). As described in prior requests for reconsideration as to the Campbell Orders, NERC's "elevated risk" designation in no way signifies an emergency condition, falls below the highest risk designation of "high risk," and is far from unusual. This point was addressed at length in the Attorney General's June 18, 2025, Request for Reconsideration as to the Campbell I Order, including specifically at pages 27 – 28, and the Attorney General hereby incorporates by reference her arguments raised therein.

LTRA."[206] The assessment further provides the following context and explanation as to how it considers those resources in the context of its other evaluations:

> The timing of FERC's approval of MISO's ERAS process in July meant that the generator additions that MISO plans as part of that process were not included in the resource adequacy modeling for the 2025 LTRA. ERAS is already expected to result in considerable new resource additions to the MISO system in the near term. The additional summer on-peak capacity from ERAS is expected to grow to over 20 GW by summer 2030. These expedited resource additions are expected to reduce the shortfall risk identified in this year's ProbA. Furthermore, the timing of the ERAS additions would mitigate an identified winter ARM shortfall if the approximately 8.6 GW of winter on-peak capacity anticipated by 2028–29 reaches operation as projected. The latest ERAS projects, along with current load forecasts and resource projections as of July 2026, will be included in the input data for the 2026 LTRA….[207]

The LTRA likewise concludes that "if ERAS projects come in as currently planned, the projected reserve margin shortfall would be eliminated."[208] Thus, not only does the Order omit the finding of merely "normal" risk during the period of the Order—which in itself rebuts any "emergency" designation[209]—the Order arbitrarily ignores key evidence from the LTRA contradicting the Department's assertions as to long-term planning.

Four months after projecting that ERAS projects could eliminate the projected longer-term reserve margin shortfall, NERC published a sensitivity case for the 2025

---

[206] *Id.*
[207] *Id.* at 16.
[208] *Id.* at 15.
[209] Even without the planned ERAS resources, the LTRA estimates only that MISO would "fall below reserve margin targets to become a high-risk area beginning Winter 2028" (the end of 2028). *Id.* This would not be a sudden or unexpected emergency during the period of the Order in February-May 2026.

LTRA that refined and confirmed this conclusion.[210] NERC reported its results as follows:

> The limited-scope sensitivity analysis confirmed 2025 LTRA findings: Timely implementation of ERAS resources would eliminate reserve margin shortfalls in MISO and improve expected unserved energy metrics. Based on MISO's updated probabilistic analysis, the MISO assessment area was found to remain at elevated risk to system reliability for the 2027 year and fall to normal risk for the 2028–2030 period with the on-time addition of all ERAS projects. Furthermore, the probabilistic analysis shows that the risk of load loss and unserved energy in 2027 is reduced with the addition and operation of these projects.[211]

The Order acknowledges that the ERAS process "should help expedite the construction of needed new capacity;" but claims that such resources will have commercial operation dates at least three years away.[212] But the Order does not cite any resource adequacy shortfalls within that period, even if such shortfalls were relevant under the legal definition of an emergency.

*k. OMS-MISO 2026 Survey.*

Next the Order discusses the Organization of MISO States (OMS) and MISO Survey, making nebulous claims about future uncertainty and risk reflected in the survey.[213] But the Order ignores key findings of the survey:

---

[210] NERC, 2025 LTRA Sensitivity Case: Addition of ERAS Resources in the MISO Assessment Area (April 2026), Attachment RR.
[211] *Id.* at 1 (citations omitted).
[212] Campbell VI Order at 7-8.
[213] Campbell VI Order at 6-7.

- "The 2026 OMS-MISO Survey results show an adaptive response to increasing demand through generation additions that sustain near-term resource adequacy."[214]
- "The region is projected to maintain sufficient capacity to meet demand across the next five years, based upon current load forecasts and anticipated load growth."[215]
- "Load Serving Entities (LSEs) are expected to have adequate resources to meet load reserve requirements in each zone."[216]

*l. NERC 2026 State of Reliability.*

Next the Order discusses NERC's 2026 State of Reliability (SOR) Technical Assessment, claiming "NERC identifies worsening reliability concerns tied to large-load integration and localized operating stress."[217] The Order cites NERC's statement that "shoulder seasons have become increasingly challenging for Bulk Power System operators to manage, resulting in several recent instances of pre-contingent load shedding."[218] However, the Order's discussion of this point is misleading. The NERC SOR Technical Assessment cites an Incident Review for the point relied on by the Order.[219] The Incident Review discusses incidents that occurred during 2024 and

---

[214] 2026 OMS MISO Survey Results (June 4, 2026) at 2, Attachment SS.
[215] *Id.*
[216] *Id.* at 3.
[217] Campbell VI Order at 7, discussing NERC, 2026 State of Reliability: Tech. Assessment of 2025 Bulk Power Sys. Performance (June 24, 2026): https://www.nerc.com/globalassets/programs/rapa/pa/nerc_sor_2026_technical_assessment.pdf.
[218] Campbell VI Order at 7, discussing NERC, 2026 State of Reliability Technical Assessment at 5.
[219] NERC, 2026 State of Reliability Technical Assessment at 5, citing Incident Review (Load-Pocket Shoulder Season Challenges) (March 4, 2026), Attachment TT.

2025 and included *both* major transmission outages *and* existing generation that was unavailable.[220] The Order makes no connection between these scenarios and the planned, orderly retirement of a coal-fired power plant.

The Order also claims that the NERC SOR finds that "large load growth is increasing reliability risk" and that "data center and computational loads continued emerging as a major reliability consideration due to their scale, speed of development, and unique operational characteristics."[221] However, the Order draws no connection between this generalized concern and the Campbell Plant, MISO Zone 7, or the MISO Central Region.

Finally, the Order claims that "data in the SOR shows that 2025 MISO summer and winter peak demands of 121.6 GW and 108.8 GW, respectively, met or exceeded extreme scenario levels showing how rapid load growth and extreme weather continue to be a real risk in MISO."[222] However, the Order ignores NERC's determination that operators managed both the winter and summer incidents without the use of load shedding.[223]

*m. Other Presidential Emergency Declarations and Memos.*

Finally, the declaration of a "national energy emergency" by the President is not itself evidence of an "emergency" for purposes of 202(c). Whatever role EO 14262 may have had in "inform[ing] the Secretary's decision" to issue the Campbell

---

[220] NERC, Incident Review, Attachment UU.
[221] Campbell VI Order at 7.
[222] *Id.*
[223] NERC, 2026 State of Reliability Technical Assessment at 27, 30.

Orders,[224] it does not provide "substantial evidence" to support the Secretary's determination. The Department may determine how it takes evidence,[225] and the Department may of course take policy direction from the President. But EO 14262 does not provide particularized facts supporting its conclusory statements about a national shortage of energy, and section 202(c) does not allow the Department to substitute the White House's say-so for "substantial evidence."[226] The same applies to the Order's discussion of the President's Memo to the Secretary of Energy regarding the coal supply chain.[227]

*n. The Department's Resource Adequacy Report.*

The Order also discusses the Department's own *Resource Adequacy Report*.[228] However, that report demonstrates that there is no emergency in MISO. The *Resource Adequacy Report* described its purpose "to evaluate both the current state of resource adequacy as well as future pressures resulting from the combination of announced retirements and large load growth."[229] The *Resource Adequacy Report* further noted that it was intended to "to identify at-risk region(s) and guide reliability interventions."[230]

---

[224] *See* Rehearing Order I ¶ 40.
[225] *See* 16 U.S.C. § 825g,
[226] *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("conclusory statements will not do; an 'agency's statement must be one of reasoning.'") (quoting *Butte Cnty., Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010)); cf. *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 230 (1938) ("substantial evidence" standard requires "more than a mere scintilla," and statutory provision allowing evidence inconsistent with rules of evidence "does not go so far as to justify orders without a basis in evidence having rational probative force").
[227] Campbell VI Order at 8-9.
[228] Campbell VI Order at 7-8.
[229] RAR at i.
[230] *Id.*

To evaluate the "current state of resource adequacy," the *Resource Adequacy Report* presented what it referred to as the "current system" model. The current system model found "relative reliability" in every region of the country except ERCOT (Texas), meaning that all regions except ERCOT were assessed to have expected loss of load hours (LOLH) and Normalized Unserved Load % that were lower than (i.e. superior to) the report's benchmark levels.[231] With respect to MISO, the *Resource Adequacy Report* stated: "In the current system model . . . MISO did not experience shortfall events."[232] In other words, the study did not identify any capacity shortfalls in MISO under current system conditions.

Remarkably, after having published a Resource Adequacy Report intended to "identify at-risk region(s)" and "guide reliability interventions" such as this one,[233] the Department declined to even acknowledge that the findings of that report flatly contradict the conclusion of this Order that there is now a resource adequacy emergency in MISO.[234]

In sum, the Order relies on a selective reading or misreading of materials and disregards other materials that demonstrate there is no emergency whatsoever during the 90-day period covered by the Order and no emergency anticipated on any longer time horizon, either. The Order's findings are arbitrary and capricious; not

---

[231] *Id.* at 7.
[232] *Id.* at 20.
[233] RAR at vi.
[234] As set forth in the Multistate Request for Rehearing, the Resource Adequacy Report suffers from a litany of procedural, methodological, and substantive flaws. But even under its flawed methodology, it did not find a resource adequacy shortfall in MISO. To the extent the Order is relying on the Resource Adequacy Report to make determinations about long-term resource adequacy, Michigan reiterates its unanswered claims. *See id.*

supported by substantial evidence; do not reflect a principled and reasoned decision supported by the evidentiary record; and provide no rational connection between the facts found and the choice made.

### B. The Order Intrudes on Authority Reserved to States and to Other Federal Regulators.

#### *i. Long-term resource adequacy is regulated by the states, and by FERC under other provisions of the Federal Power Act.*

Resource adequacy refers to the capacity of an electric power system to meet demand reliably at all times, including during system peaks and through potential outages. Resource adequacy is "measured at the system level to capture the overall impact of outages of individual components including generators and transmission."[235] Resource adequacy planning is a long-term process, unfolding over years, through which utilities and system operators, under regulatory supervision, ensure resource adequacy. Resource adequacy planning involves technical and economic considerations that go into determining what resources are added to the grid, which resources qualify as "capacity resources," and which resources should retire and when.

With respect to regulatory oversight for resource adequacy, section 201 of the FPA, 16 U.S.C. § 824(b)(1), reserves authority over generation facilities to the states. It states in pertinent part: "The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, *but shall not have jurisdiction*, except

---

[235] NREL, Resource Adequacy Basics, available at https://www.nrel.gov/research/resource-adequacy, Attachment CC.

as specifically provided in this subchapter and subchapter III of this chapter, *over facilities used for the generation of electric energy* or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter."[236]

Some states have retained this authority over resource adequacy in its entirety.[237] Others have directed or permitted their utilities to join RTO/ISOs that, through their tariffs, impose resource adequacy requirements. Those RTO/ISOs also generally establish markets that allow market participants to buy and sell capacity and thereby to facilitate market entry and exit decisions based on price signals. The federal role in long-term resource adequacy is limited: FERC, through its regulation of just and reasonable interstate rates, may regulate certain aspects of resource adequacy in RTO/ISO tariffs as practices affecting wholesale rates.[238]

In Michigan, the regulation of long-term resource adequacy planning has both a state and federal aspect. As a member of MISO, Consumers has a capacity obligation under the MISO tariff. MISO's resource adequacy requirements, however, are designed to be complementary to the primary role of the states in ensuring

---

[236] 16 U.S.C. § 824(b)(1) (emphasis added).
[237] *See Devon Power LLC et al.,* 109 FERC ¶ 61,154, P 47 (2004) ("Resource adequacy is a matter that has traditionally rested with the states, and it should continue to rest there. States have traditionally designated the entities that are responsible for procuring adequate capacity to serve loads within their respective jurisdictions.").
[238] *See Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 483 (D.C. Cir. 2009); 16 U.S.C. §§ 824d & 824e.

resource adequacy.[239] Consumers' investment decisions are regulated by the MPSC. Through the state IRP process described above, the MPSC exercises regulatory authority over Consumers in order to ensure that the utility obtains the amount of capacity it needs to meet its obligations under the MISO tariff, and that it does so at the best value to ratepayers, and with a composition of resources that otherwise complies with state law, including state environmental requirements.

*ii. Section 202(c) does not vest DOE with general regulatory authority over long-term resource adequacy.*

The Order demonstrates the Department's belief it can regulate long-term resource adequacy by declaring an emergency under section 202(c), on the thinnest rationale, that lasts for years on end.[240] By declaring a permanent emergency, the Department appears to believe it has ultimate decision-making authority over:

(i) which power plants retire and when;

---

[239] *Midcontinent Indep. Sys. Operator, Inc.*, 170 FERC ¶ 61,215, 62,606 at P 13 (2020) ("approximately 90% of the load in MISO is served by vertically integrated LSEs, the vast majority of which are subject to state integrated resource planning processes. To accommodate the make-up of the MISO's footprint, MISO's proposed Tariff provisions accepted in the February 2018 Order provide that its resource adequacy requirements "are complementary to the reliability mechanisms of the states and the Regional Entities ... within the [MISO] region."); *see also id.* ("MISO's proposed Tariff language explains that the resource adequacy requirements 'are not intended to and shall not in any way affect state actions over entities under the states' jurisdiction.' In other words, unlike the centralized capacity constructs used in the Eastern RTOs/ISOs, MISO's Auction is not—*and has never been*—the primary mechanism for its [Load Serving Entities] to procure capacity."); *Midwest Indep. Transmission Sys. Operator, Inc.*, 119 FERC ¶ 61,311, 62,722 at P 75 (2007) ("From the beginning . . . the Commission has recognized the role that state resource planning plays in managing the resource adequacy of [MISO]").

[240] Campbell VI Order at 10 (describing emergency conditions that "will continue in the near term and are also likely to continue in subsequent years"); *see also* Campbell IV Order at 3 ("[t]he emergency conditions that necessitated the issuance of Order Nos. 202-25-3, 202-25-7, 202-25-9, 202-26-16, 202-26-22 continue, both in the near *and long term*" (emphasis added)).

(ii) how much resource adequacy is appropriate for a particular state or region (without any consideration of the cost/benefit tradeoffs),

(iii) which generators may qualify as capacity resources[241] (thereby superseding a carefully considered, highly complex set of capacity qualification criteria for generation resources, designed by the states and MISO and approved by state regulators and FERC[242]); and

(iv) and how those generators shall dispatch.[243]

Section 202(c) does not provide the Department with the authority it claims. Had Congress intended to vest regulatory authority over long-term resource adequacy in section 202(c)—displacing both state law and sections 205 and 206 of the Federal Power Act—it would have stated so clearly. But of course it did not. The authorizing language says no more than that DOE may "require by order . . . such generation . . . of electric energy as in its judgment will best meet the emergency and serve the public interest."

Indeed, it defies logic that, had Congress intended to empower DOE to be the general decider of which power plants may retire across every utility and independent power producer across the entire country—a function with profound implications for rates, state sovereignty, and a broad array of other stakeholder interests—that

---

[241] *Id.* at 11, Paragraph G (declaring that "the Campbell Plant shall not be considered a capacity resource.").
[242] *See, e.g., Coal. of Midwest Power Producers, Inc.*, 166 FERC ¶ 61,159 (2019) (evaluating a complex dispute about the appropriate capacity eligibility approach in MISO)
[243] Campbell VI Order at 11, Paragraph A (directing MISO to "take every step to employ economic dispatch of the Campbell Plant").

Congress would have done so through what may be the only provision in the Federal Power Act that empowers the regulator to act without first assessing the effect on ratepayers or seeking public input, and one of the only provisions that extends to otherwise non-jurisdictional utilities such as public power entities and those in ERCOT.

But even if the text of section 202(c) could, theoretically, be stretched to such an expansive reading (which it cannot), the United States Supreme Court has emphatically rejected statutory interpretations whereby an agency "claim[s] to discover in a long-extant statute an unheralded power representing a transformative expansion in its regulatory authority."[244] That is exactly what the Department seeks to do here. It seeks to discover in a 90-year-old statute a basis to exercise much broader regulatory authority than it ever has in the past. While it is true, as we explain above in section II.A, that the Department has used section 202(c) to delay power plant retirements on three occasions over the 90-year history, it has always done so at the request of a system operator or governmental body and in a manner narrowly tailored to prevent a concrete and particularized emergency. It has never

[244] *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 724–25, (2022) (quoting *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014)) (internal quotations omitted).

done so simply to impose its policy preferences ahead of the judgment of those bodies responsible for resource adequacy.[245]

Equally clear, the Department lacks authority to declare that the Campbell Plant is not a capacity resource. Whether the Campbell Plant is or is not a "capacity resource" only has legal meaning by reference to MISO's tariff. MISO's tariff is a wholesale electric rate subject to FERC's jurisdiction under sections 205 and 206 of the Federal Power Act. The Department lacks any authority to alter MISO's tariff or to render a determination as to how the Campbell Plant might be evaluated under the MISO tariff.

### C. The Order Fails to Present Substantial Evidence for its Emergency Determination and Fails to Exercise Reasoned Decision-making by Ignoring Critical Facts.

As described above, the Department has failed to provide facts to substantiate the existence of an emergency over the period of the Order. It also ignores several critical facts that are relevant to its emergency finding, and thereby fails to exercise reasoned decision-making.

Again, to the extent the Department intends to rely on the facts it presented in the first five Campbell Orders to substantiate its assertion that an emergency

---

[245] Nor could the Department find authority by characterizing its intervention as one aimed at "reliability" rather than "resource adequacy." In 2005, to establish a mechanism for addressing reliability, Congress adopted a complex regulatory scheme drawing on technical expertise, providing a public input process, and requiring an assessment of tradeoffs, including cost. *See* Energy Policy Act of 2005, Pub. L. 109–58, § 1211(a), 119 Stat. 594, 941-46 (2005) (amending the FPA to adopt a reliability regulatory scheme at section 215, 16 U.S.C. § 824o). That Congress did not see fit to provide DOE any formal role, except in the extremely narrow case of a cybersecurity emergency, *see* 16 U.S.C. § 824o-1, is strong evidence that it did not intend DOE to act as an all-powerful regulator of electric grid reliability by invoking its extant authority under section 202(c).

continues during the period of the Campbell VI Order, the responses and rebuttals of the Michigan AG are incorporated herein.[246]

*i. The Order Continues to misrepresent the 2025/2026 NERC Winter Reliability Assessment.*

As explained above, the Department continues to misrepresent the results of the 2025/2026 NERC Winter Reliability Assessment and significance thereof. Those points discussed above are incorporated by reference here as well.

*ii. The Order's references to Winter Storm Fern fails to identify any evidence or exhibit any reasoning that might support its "emergency" determination.*

As explained above, the Order's brief discussion of Winter Storm Fern fails to provide any operational details or other support for its conclusions about a supposed "emergency" during the period of the Order, nor does it posit any reasoning thereon. Those points discussed above are incorporated by reference here as well.

*iii. The recent NERC LTRA undermines DOE's assertions of an emergency, even if considering far-distant resource adequacy planning.*

As explained above, the recent NERC LTRA as described by DOE categorizes MISO as merely "normal risk" during the period of the Campbell VI Order. And for the purpose of longer-term estimates, the LTRA further describes the ERAS process as avoiding any margin shortfall in MISO that might potentially materialize in late 2028. Those points discussed above are incorporated by reference here as well.

---

[246] Michigan AG's Requests for Rehearing from June 18, 2025, September 11, 2025, December 16, 2025, and March 19, 2026, June 17, 2026.

*iv. The Order fails to acknowledge that the Department's own Resource Adequacy Report Contradicts its Emergency Finding.*

As explained above, after having published a Resource Adequacy Report intended to "identify at-risk region(s)" and "guide reliability interventions" such as this one,[247] the Department declined to even acknowledge that the findings of that report flatly contradict the conclusion of this Order that there is now a resource adequacy emergency in MISO.[248] It would be difficult to conceive of an agency action that more completely fails to meet the standard of reasoned decision-making.

*v. The Order fails to acknowledge that MISO approved the retirement of J.H. Campbell.*

As explained above, after a robust, technical, and considered process, MISO approved the retirement of the three J.H. Campbell units pursuant to the study process governed by its tariff. MISO concluded that "the suspension of Campbell Units 1, 2 & 3 would not result in violations of applicable reliability criteria." As also noted above, MISO has sustained that approval consistently as Campbell's retirement date has been pushed back. As the system operator, MISO has more in-depth knowledge of its system than the Department does. The Department should have explained why it reached a different conclusion than MISO. Instead, the Order failed even to mention that MISO conducted this study and approved the retirement.

[247] RAR at vi.

[248] As set forth in the Multistate Request for Rehearing, the Resource Adequacy Report suffers from a litany of procedural, methodological, and substantive flaws. But even under its flawed methodology, it did not find a resource adequacy shortfall in MISO. To the extent the Order is relying on the Resource Adequacy Report to make determinations about long-term resource adequacy, Michigan reiterates its unanswered claims. *See id.*

*vi. The Order makes no effort to review the findings of the MPSC or to demonstrate consultation with Michigan as required by 42 U.S.C. § 7113.*

The Order acknowledges that Consumers acquired the Covert gas plant, but in all other respects fails to acknowledge the MPSC proceeding that approved Consumers' IRP settlement entailing retirement of J.H. Campbell. As explained above, acquiring the Covert gas plant was not the only action Consumers took as part of that IRP. The IRP also delayed the retirement of the peaking units at the Karn facility and included the acquisition of other new resources, with the result that Consumers' capacity position was set to improve materially even after the retirement of J.H. Campbell. The Order also ignores the Michigan capacity demonstration proceedings that found both Consumers and MISO Zone 7 have sufficient capacity resources in 2026 and in the years to come.

Section 103 of the Department of Energy Organization Act, 42 U.S.C. § 7113, provides:

> Whenever any proposed action by the Department conflicts with the energy plan of any State, the Department shall give due consideration to the needs of such State, and where practicable, shall attempt to resolve such conflict through consultations with appropriate State officials.

The Order plainly conflicts with Michigan's energy plan, as reflected in the MPSC's approval of Consumers' IRP. Equally clearly, the Order does not give "due consideration" to the needs of Michigan. Nor does it appear that the Department made any attempt to resolve the conflict it created through consultation with the appropriate State officials. The Department, therefore, has failed to comply with Section 103 of the Department of Energy Organization Act. The September 8

Rehearing Order acknowledged that Section 103 binds the Department but asserted that the provision did not apply to the Campbell I Order because consultation was not "practicable" in that context. This assertion was wrong with respect to the Campbell I Order: the retirement date of the Campbell Plant had been established years earlier and there was ample time for consultation. In any event, consultation certainly was practicable prior to the Campbell II, Campbell III, Campbell IV, and Campbell V Orders and prior to this Order. "[W]here, as here, Congress has directed an agency to consult with States before taking action that may curtail traditional State powers, . . .the agency [must] heed Congress's direction."[249] The Department had 360 days following the issuance of the Campbell I Order to determine whether to issue this Order and had no excuse not to conduct the statutorily required consultation in that time.

*vii. The Order fails to provide any specific evidence or reasoning why J.H. Campbell must remain in operation and why alternative measures are inadequate.*

Even accepting the Order's contention that there exists a capacity shortfall in MISO, it does not follow that commanding the continued operation of J.H. Campbell is the best or even an appropriate means of alleviating the shortfall. As discussed further below, under 202(c) the Department must adopt a remedy that "best meets" the emergency. Whatever the extent of the Secretary's discretion in making that determination, it must be supported by substantial evidence and reasonable decision-

[249] *Cf.* California Wilderness Coal. v. U.S. Dep't of Energy, 631 F.3d 1072, 1087 (9th Cir. 2011) (vacating DOE action for failure to comply with statutory requirement to consult with affected states).

making. But the Order musters no evidence—certainly not "substantial evidence" —and offers no reasoning justifying the measure it chose over any other.

The Order does not assert that there is a local problem on the grid that only J.H. Campbell can solve. In this respect, the Order departs markedly from past uses of section 202(c) and from the Department's regulations implementing section 202(c), which state that: "Actions under this authority are envisioned as meeting a specific inadequate power supply situation."[250]

Rather, the emergency that the Order purports to identify—insufficient resource adequacy—is one that the Department claims to span the entire fifteen-state MISO region and one that could presumably be addressed by any number of actions across MISO. And, given that J.H. Campbell amounts to well less than 1% of generation capacity in MISO, there are likely options available that would have a much greater impact on the overall balance of supply and demand. Further, because J.H. Campbell is an over 60-year-old facility in a largely degraded operational state, there presumably were more reliable alternatives available to meet the purported need. Indeed, the multitude of possible options available for meeting resource adequacy shows why RTO/ISOs like MISO have employed market mechanisms and why states like Michigan rely on integrated resource planning through which a range of different measures for ensuring resource adequacy are evaluated alongside one another.

---

[250] 10 C.F.R. § 205.371.

Yet the Order does not acknowledge any alternatives or explain whether less burdensome measures were exhausted before taking this action.[251] The question of whether alternative measures could have been used to address the "emergency" is made more challenging by the fact that the Order never quantifies the extent of the emergency it purports to identify within MISO. But that omission merely highlights rather than excuses the deficiencies of the Order.

One possible alternative may have been demand-side measures. The Department's regulations require applicants seeking an order under section 202(c) to provide a "description of any conservation or load reduction actions that have been implemented . . . [and a] discussion of the achieved or expected results."[252] In the Yorktown case, the Department required Dominion to exhaust all demand response measures before dispatching the facility.[253] And yet here the Department failed to make any inquiry or even to consider whether demand-side measures could have addressed the purported emergency. Similarly, the Department's regulations require applicants to describe their efforts made to obtain additional power through third parties.[254] But again, the Department failed to consider whether MISO could alleviate the purported emergency through access to external resources.

---

[251] As explained more completely below, section 202(c) authorizes the Department to order only such actions as are "best" able to meet the emergency. This mandate necessarily requires a comparison to potential alternatives. *See Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009) (interpreting "best" as a term requiring a comparison to alternatives and to be the alternative that is "most advantageous" on some relevant metric).

[252] 10 C.F.R. § 205.373.

[253] *See* DOE Order No. 202-17-4 (Sept. 14, 2017) ("PJM and Dominion shall exhaust all reasonably and practically available resources, including demand response and behind-the-meter generation resources, prior to operating Yorktown Unit 1 or Yorktown Unit 2.")

[254] 10 C.F.R. § 205.373(h).

Nor does the Order make any attempt to explain how continued operation of J.H. Campbell would meet the supposed "emergency" at all. The Order claims that an "emergency" exists not only in the near term, but also through *subsequent years*.[255] Plainly, a 90-day extension of the Order cannot "best meet" such an emergency. The Campbell VI Order never even gestures at an explanation.

### D. The Department's Direction that MISO Operate J.H. Campbell Using "Economic" Dispatch Is Inconsistent with its Authority under Section 202(c) and is Arbitrary and Capricious.

The Department's Order directs MISO to "take every step to employ economic dispatch of the Campbell Plant."[256] The Order indicates that the use of economic dispatch is intended to "minimize cost to ratepayers."[257] However, this mandate to MISO exceeds the authority provided by section 202(c). Nor does the Order explain how the use of economic dispatch is likely to serve the public interest.

The Order does not define "economic dispatch" or specify how it intends MISO to dispatch the units. In the Energy Policy Act of 2005, Congress adopted a definition of "economic dispatch" that generally conforms to accepted use: "the operation of generation facilities to produce energy at the lowest cost to reliably serve consumers, recognizing any operational limits of generation and transmission facilities."[258] Drawing on this statutory definition, FERC issued a 2006 report, *Security Constrained Economic Dispatch: Definitions, Practices, Issues, and*

---

[255] Campbell VI Order at 10.
[256] *Id.* at 11 (Ordering Paragraph A)
[257] *Id.*
[258] *See* section 1234(b) of the Energy Policy Act of 2005, 42 U.S.C. § 16432(b).

*Recommendations,* that provides a useful explanation of the 2-step process that regions have, in practice, adopted to implement economic dispatch.[259] This process includes (1) day ahead unit commitment, in which grid operators commit generators to be online in the subsequent 24-hour period, *determined based on which generators will be most economic*, taking into account each unit's physical operating characteristics, and (2) unit dispatch, in which grid operators dispatch committed resources at specified levels, in real-time, *determined based on what set of units will minimize total system costs*, given actual load, generation, and transmission conditions and constraints.[260]

Section 202(c) authorizes DOE to direct certain actions during emergency conditions. As relevant here, section 202(c)(1) provides DOE with "authority . . . to require by order . . . such generation . . . of electric energy as in its judgment will *best meet the emergency* and serve the public interest." In other words, DOE's power extends only to ordering actions that best meet the emergency that the Department has identified. While section 202(c) provides DOE a degree of discretion to determine the appropriate remedy by authorizing action based on the "judgment" of the Secretary, "the use of the word 'judgment' is not a roving license to ignore the statutory text,"[261] The Department must determine that the remedy:

---

[259] FERC, *Security Constrained Economic Dispatch: Definitions, Practices, Issues, and Recommendations* (July 31, 2006), https://www.ferc.gov/sites/default/files/2020-05/final-cong-rpt.pdf, Attachment DD.
[260] *Id.* at 5-6.
[261] *Massachusetts v. EPA*, 549 U.S. 497, 533 (2007).

- Is "best" (rather than merely available[262]),
- would "meet" the emergency—that is, that the solution identified is aimed at the circumstances giving rise to the order (under a reasonable interpretation of "emergency"[263]),
- and that it serves "the public interest" (under purposes of the Federal Power Act[264]).

Moreover, the Secretary must exercise that judgment in a rational, reasoned, non-arbitrary manner, supported by substantial evidence.[265]

Economic dispatch is not a rational response to the types of emergencies that section 202(c) actually authorizes DOE to address. Nor would economic dispatch be a rational approach to addressing the circumstance that DOE is purporting to address with its order—a potential capacity shortfall—if that were within its authority under section 202(c). In fact, DOE has made no effort to explain why economic dispatch is a rational remedy here—let alone the "best" means of meeting the "emergency" that it

---

262 *See Entergy Corp.,* 556 U.S. at 218 (interpreting "best" as a term requiring a comparison to alternatives and to be the alternative that is "most advantageous" on some relevant metric); Such comparison need not be burdensome, particularly in circumstances—unlike the one at issue here—where an emergency presents itself unexpectedly and for which the Department has limited time to act. But certainly in this case, where the Department had months to evaluate the continued need for J.H. Campbell, the Department cannot reasonably determine that continued operation is "best" without having compared it to alternatives.

263 *See* Section IV.A.

264 *NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 669 (1976) ([T]he term 'public interest' . . . . take[s] meaning from the purposes of the regulatory legislation").

265 *Emera Maine v. FERC*, 854 F.3d 9, 22 (D.C. Cir. 2017) (order under the Federal Power Act must reflect "a principled and reasoned decision supported by the evidentiary record" (quotation marks omitted); *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("conclusory statements will not do; an 'agency's statement must be one of *reasoning.'") (quoting Butte Cnty., Cal. v. Hogen, 613 F.3d 190, 194 (D.C. Cir. 2010)); 16 U.S.C. 825l(b).*

has identified.[266] And, unlike prior Orders, here DOE acted on its own motion without a request or input of MISO and so cannot rely on the expertise of the cognizant grid operator or operating utility requesting a specific remedy to justify the appropriateness of economic dispatch.[267]

*i. Economic dispatch is not a rational response to a shortage of electric energy.*

Economic dispatch is a standard procedure by which operators (such as MISO) operate the grid. However, outside of normal operations, including during emergency conditions, generation units may be selected "out of merit order" as necessary to ensure that generation and load are balanced. Operating a unit pursuant to economic dispatch is, necessarily, inconsistent with operating the unit in a manner designed to address an emergency, such as a shortage of electric energy. If a unit would be dispatched under purely economic conditions, but electric demand can alternatively be met with other existing supply (or demand response) resources, that unit is *not* necessary to meet the emergency. However, if the unit would, in fact, be needed to address a shortage, it should be dispatched regardless of whether its offer price is above or below the market-clearing price. In other words, economic dispatch is not a dispatch rule that is reasonably tailored to ensure that the unit addresses a shortage of electric energy.

---

[266] ARCO Oil & Gas Co. v. FERC, 932 F.2d 1501, 1504 (D.C. Cir. 1991) ("The Commission's conclusory statements cannot substitute for the reasoned explanation that is wanting in this decision").
[267] *See* DOE Order No. 202-18-1 at 4 ("In this situation, the expertise of the applicant was an important factor. The Department received an application from PJM, which . . . holds the highest-level, federally-regulated reliability responsibilities for the system it manages."), https://www.energy.gov/sites/prod/files/2017/11/f46/Summary%20of%20Findings%20Order%20No.%20202-18-1.pdf.

Prior DOE orders have contained significant operating constraints to satisfy the statutory requirement that the generation "best meet the emergency and serve the public interest." Orders, including an order issued as recently as June 2025, have specified that units subject to a section 202(c) order should only run in specific emergency alert conditions — specific conditions in which grid operators have exhausted the capacity of other available generators, imports, and voluntary demand response, and failure to call on additional generation will risk involuntary load shed.[268] Similarly, in its order to delay retirement of the Yorktown plant, DOE recognized that dispatch of the units must be constrained, that continued operation of the units under the standard methodologies used by the local utility (Dominion Energy Virginia) and grid operator (PJM) would not be appropriate, and that Dominion and PJM must exhaust available resources, including demand response and behind-the-meter generation resources, prior to operating Yorktown Units 1 or 2.[269] Similarly, in the case of its 2005 District of Columbia Department of Public Service order, the Department directed Mirant to maintain its facility's capacity to respond when needed, but only ordered it to run when one or both of the 230 kV

---

[268] DOE Order 202-25-5 (Order issued during recent heat event authorizing operation of Duke Energy North Carolina resources only during Energy Emergency Alert Level 2 or Level 3 events): *see also* DOE Order No. 202-22-4 (authorization under similar conditions); DOE Order No. 202-22-3 (same); DOE Order 202-22-1 (same); DOE Order No. 202-21-2 (same); DOE Order No. 202-21-1 (same).

[269] DOE Order No. 202-17-2 (providing that Yorktown units 1 and 2 may be dispatched "only when called upon to address reliability needs" and directing PJM and Dominion Energy Virginia "to provide the dispatch methodology to the Department upon implementation, and to report all dates on which Yorktown Units 1 and 2 are operated"); DOE Order No. 202-18-1 at 3 (relying on the fact that DOE "require[d] PJM and Dominion to exhaust available resources, including demand response and behind-the-meter generation resources, prior to operating Yorktown Units 1 or 2").

transmission lines serving downtown D.C. were out of service.[270] And in its 2017 order regarding GRDA's Grand River Energy Center Unit 1, the Department strictly limited its remedy, directing GRDA only to provide "dynamic reactive power support and not real power generation, and only when called upon by SPP for reliability purposes."[271] The Campbell VI Order contains no such constraints, and it fails to explain or justify such deviation from consistent past practice.

*ii. Economic dispatch is an arbitrary response to any alleged capacity shortage.*

Indeed, even on DOE's own terms, the justification for the Order does not support ordering J.H. Campbell to operate whenever MISO's economic dispatch rules would select it to operate. The Order points repeatedly to questions about the sufficiency of electric *capacity* and the ability of MISO to meet load during periods of high demand and low resource output over the next 90 days (and possibly for years to come) as the basis for its emergency determination. For example, the Order concludes that "the emergency conditions that necessitated the issuance of [the Campbell I through Campbell V Orders] continue, both in the near and long term."[272] This conclusion was and remains based on the various NERC and MISO resource adequacy documents discussed above.[273] The Campbell VI Order doubles down on the fact that DOE's emergency declaration stems from concerns about the sufficiency of

---

[270] DOE Order No. 202-05-3 (Dec. 20, 2005), District of Columbia Public Service Commission at 10 – 11.
[271] DOE Order No. 202-17-1 at 2.
[272] Campbell VI Order at 3.
[273] *Id*. at 2-3.

capacity (otherwise referred to in the Campbell VI Order as "resource adequacy"). The Order identifies "resource adequacy problems" outside of the summer period as the basis for continuing the order over the full 90-day period.[274] It acknowledges some reliability measures MISO has taken, but discounts them because they are "unlikely to result in the addition of any new generation *capacity* in the next few years."[275]

But dispatch of J.H. Campbell at any time other than a specifically identified operating reserve shortfall (e.g., a concrete expected supply/demand imbalance)—let alone dispatch whenever the plant would be called upon by MISO's economic dispatch algorithm—is *not* necessary to address the type of emergency that the DOE order identifies. Even if the Order sufficiently justified retention of J.H. Campbell as a capacity resource (which it does not for the reasons outlined above), it would not follow that J.H. Campbell's electric *energy* is needed to address the identified emergency.[276]

Given the nature of the alleged emergency identified in the Order, no dispatch from J.H. Campbell should be necessary unless and until called upon by MISO expressly to address an emergency purpose.

---

[274] *Id,* at 5.
[275] *Id.* at 8.
[276] *See generally Conn. Dep't of Pub. Util. Control*, 569 F.3d at 479 ("'Capacity' is not electricity itself but the ability to produce it when necessary. It amounts to a kind of call option that electricity transmitters purchase from parties-generally, generators-who can either produce more or consume less when required. The penultimate and most proximate buyers of capacity (before the consumers who ultimately shoulder the costs in their utility bills) are called 'load serving entities' or LSEs-the public utilities that deliver electricity to end users.").

*iii. "Economic dispatch" is not in the public interest in this case.*

Section 202(c) also requires that DOE determine that a given remedy is in the public interest.[277] The public interest determination is not an independent or sufficient criteria to order any particular action. Rather, Congress's use of the conjunctive "and" in section 202(c)(1) clearly prohibits DOE from ordering actions that the Department believes will advance the public interest if those actions exceed what is needed to address the identified emergency. In fact, DOE acknowledged this limit on its authority in its order denying rehearing of its order directing the retention of the Yorktown power plant.[278] Therefore, for the reasons explained above, economic dispatch is not appropriate even *if* DOE determines that it would advance the public interest.

However, DOE's vague direction to MISO to operate Campbell using "economic dispatch" will not further the public interest."[279] DOE's order does not explain why it believes economic dispatch would be in the public interest, other than a general reference to "minimize[ing] cost to ratepayers." However, this justification fails for two reasons. First, the Order's reference to economic dispatch is ambiguous and leaves open the likelihood that Consumers will operate the facility even at times when its operation will have the effect of *increasing* costs to consumers For example, Consumers is likely to commit J.H. Campbell into MISO's day ahead electricity

---

[277] 16 USC § 824a (c)(1).
[278] DOE Order 202-18-1 at 4.
[279] *NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 669 (1976) ([T]he term 'public interest' . . . . take[s] meaning from the purposes of the regulatory legislation").

market as a "must run" unit, rather than using Emergency commitment.[280] In other words, Consumers will operate the units at least at minimum load every day rather than when there is a forecasted shortfall (e.g., due to unexpected load, unit outage, or a natural disaster). In such circumstances, J.H. Campbell will run at its minimum operational level regardless of whether doing so is truly economic. As a result, DOE has not justified, and cannot be reasonably certain, that economic dispatch will "minimize cost to ratepayers"— its sole explanation for the operational profile it has directed MISO to adopt. In other words, DOE's ordering of economic dispatch in this case is arbitrary.

Moreover, by directing economic dispatch, rather than reserving J.H. Campbell for discrete supply shortages by committing it as Emergency status, DOE's order will result in the facility operating significantly more than necessary. Because J.H. Campbell is old, and because Consumers has been deferring maintenance in anticipation of its retirement, a significant step-up in operation caused by must-run commitment and economic dispatch will increase the likelihood that one or more units break, requiring costly maintenance to continue operating. Such repairs would likely further increase costs to ratepayers—costs that would be less likely to occur under an operational order better tailored to the emergency that DOE has identified. For example, DOE could have minimized the risk of ratepayer costs had it directed Consumers and MISO to commit (and ultimately dispatch) the facility only after analysis showing a likely near-term supply/demand imbalance or short-term

[280] *See* MISO Tariff, Section 39.2.5.b.xxvi (discussing Emergency Commitment Status).

emergency conditions (such as during extreme weather, or the forced outage of a large generator or transmission line). The Order is arbitrary and capricious by ordering operation that risks increasing costs to ratepayers, the very outcome DOE has said it is looking to avoid.

Second, the Order fails to consider, let alone explain away, the fact that the State of Michigan has made an independent judgment that it would be in the best interest of ratepayers, the state, and the environment, to accept Consumers' proposal to retire J.H. Campbell. As explained above, the State of Michigan and MISO each went through robust processes to assess the need for J.H. Campbell (or lack thereof), as well as the economic and environmental impacts of its continued operation. The State of Michigan was not consulted on DOE's Order, notwithstanding the extensive process that it underwent to evaluate whether retirement would be in the public interest. Here, the public interest is best effectuated by respecting Michigan's considered decision to approve the closure of J.H. Campbell plant, rather than allowing its near continuous operation.

Finally, for the reasons explained more fully below, the Order fails to consider the increased air and water pollution that will be caused by J.H. Campbell operating pursuant to economic dispatch instructions. DOE fails to even consider these harms, let alone weigh them against the (alleged) benefits of increased operation, in its determination that economic dispatch of the J.H. Campbell plant will further the public interest.

**E. The Department failed to limit its remedy as required by 202(c)(2).**

Section 202(c) imposes strict substantive limits on the Department's authority to issue emergency orders that "*may result* in a conflict with a requirement of any Federal, State, or local environmental law or regulation."[281] Congress deliberately included these limitations to prevent section 202(c) from becoming a de facto exemption from environmental regulation. Here, DOE failed to comply with the statute's express constraints and therefore acted unlawfully.

*i. Section 202(c)(2) contains distinct and binding legal constraints.*

Congress imposed critical limitations on the scope of any DOE emergency order that may result in a conflict with environmental laws:

*Temporal Constraint.* First, DOE must "ensure that such order requires generation . . . of electric energy only during hours necessary to meet the emergency and serve the public interest."[282] Again, this is a conjunctive requirement such that both conditions—operation in a given hour must be necessary to meet the emergency *and* operation in a given hour must serve the public interest—must be satisfied.[283] Moreover, by referring to the "hours" necessary to meet the emergency, Congress placed a high burden on DOE to demonstrate that the remedy provided was narrowly tailored to the specifics of the emergency that the order is designed to address.

---

[281] 16 U.S.C. § 824a(c)(4)(A).
[282] *Id.* § 824a(c)(2).
[283] DOE Order No. 202-18-1 at 4 (Nov. 6, 2017).

*Environmental Constraint.* Second, the Department must "ensure that such order . . ., to the maximum extent practicable, is consistent with any applicable Federal, State, or local environmental law or regulation and minimizes any adverse environmental impacts."[284]

*Length Constraint.* Third, any order that may result in a conflict with environmental law must "expire not later than 90 days after it is issued."[285] DOE can renew or reissue orders after the 90-day period, as DOE determines is necessary to meet the emergency and serve the public interest.[286]

*Renewal Constraint.* Finally, section 202(c) requires that "in renewing or reissuing" such an order, DOE must consult with the Environmental Protection Agency[287] and "shall include in any such renewed or reissued order such conditions as [EPA] determines necessary to minimize any adverse environmental impacts to the extent practicable."[288]

*ii. The Campbell VI Order is subject to these binding legal constraints.*

The Campbell VI Order is "an order issued under [section 202(c)] that may result in a conflict with a requirement of any Federal, State, or local environmental

[284] 16 U.S.C. § 824a(c)(2).
[285] *Id.* § 824a(c)(4)(A).
[286] Id.
[287] Section 202(c) specifically directs consultation with "the primary Federal agency with expertise in the environmental interest protected by such law or regulation." 16 U.S.C. § 824a(c)(4)(B). For the purposes of environmental interests primarily affected by coal plants, including emissions of air pollutants, water pollutants, and solid waste, EPA is the relevant primary Federal agency. *See* Department of Energy Order 202-17-4 Summary of Findings at 10, https://www.energy.gov/sites/prod/files/2017/09/f36/Order%20202-17-4%20Summary%20of%20Findings.pdf.
[288] 16 U.S.C. § 824a(c)(4)(B).

law or regulation."[289] Therefore, it must comply with the four legal constraints outlined above.

There are numerous environmental requirements that are affected by the continued operation of the J.H. Campbell facility, including Clean Air Act and Clean Water Act permitting requirements,[290] and Michigan's State Implementation Plan implementing the Clean Air Act's National Ambient Air Quality Standards and Regional Haze requirements,[291] among others. The Campbell VI Order includes no provisions that would prevent the operation of J.H. Campbell from operating in a manner that creates conflicts with these requirements. As a result, the Order "may result" in such a conflict. In fact, in its Campbell I Order, the Department acknowledged that, as a result of equivalent operational directives as are included in the Campbell VI Order for the exact same facility,[292] "additional generation may result in a conflict with environmental standards and requirements" and so it was required to limit additional generation from J.H. Campbell.[293] The Campbell VI

---

[289] 16 U.S.C. § 824a(c)(4)(A).
[290] *See* Michigan Department of Environment, Great Lakes, and Energy, Renewable Operating Permit Issued to Consumers Energy, J.H. Campbell Generating Complex [J.H. Campbell ROP] (July 2, 2021), Attachment EE.
[291] *See, e.g.,* Michigan Department of Environment, Great Lakes, and Energy Air Quality Division, Supplement to Michigan's August 23, 2021, Regional Haze State Implementation Plan Revision for the Second Planning Period at 2 (March 2025), https://www.michigan.gov/egle/-/media/Project/Websites/egle/Documents/Programs/AQD/State-Implementation-Plan/Notices-and-Activities/MI-Regional-Haze-SIP-Supplement-2021.pdf, Attachment KK ("Overall, EGLE's [Long-Term Strategy] *relies on* on-the-books and on-the-way control measures that include, among other things, the retirements of 30 coal and fossil-fuel fired EGUs at 12 different power plants during the second implementation period. . . . On the way are also the retirements of 3 more coal-fired EGUs required under a settlement agreement by May 31, 2025, representing additional reductions in emissions of 2,346 tpy NOX and 12,850 tpy SO2 based on the 2016 inventory.").
[292] *Compare* Campbell VI Order at 11 *with* Campbell I Order at 2-3
[293] Campbell I Order at 2.

Order also appears to itself acknowledge that it is subject to the legal constraints. The term of the Campbell VI Order is only 90 days—the statutory maximum for orders subject to environmental requirement-based legal constraints—despite the fact that DOE's justification explicitly states that the alleged emergency "will continue in the near term and are also likely to continue in subsequent years."[294] And DOE's order states that it "shall not preclude the need for the Campbell Plant to comply with applicable state, local, or Federal law or regulations *following the expiration of this Order,*"[295] acknowledging that the plant is not subject to such laws or regulations during the term of the order.

Moreover, the Order is clearly an order renewing or reissuing a prior order. And that prior order was subject to the same legal constraints, as the Department itself acknowledged in the May 2023 Order. As such, the Campbell VI Order is subject to the renewal constraint.

*iii. The Order violates Section 202(c)(2)'s temporal constraint.*

DOE has directed the unit to operate for the entire statutory maximum of 90 days. And, as described in more detail *supra,* within that 90-day window, DOE has directed the use of "economic dispatch"—an operational direction that will likely result in Campbell operating at least at its minimum output level, and more likely at the maximum output Consumers can manage, taking into account the state of the facility, continuously for the 90-day period—without providing any other temporal

---

[294] Campbell VI Order at 10.
[295] *Id* at 11 (Ordering Paragraph F).

limitation on operations. In other words, the Order appears to assume, without explanation, that an emergency will exist in every hour over the entire 90-day period of the Order that Consumers submits a bid into MISO's energy auction that is lower than the market-clearing price. There is no reason to expect that this will be the case.

For these reasons, the Order's direction that MISO economically dispatch J.H. Campbell is flatly inconsistent with section 202(c)'s requirement that emergency orders be limited to "only" those "hours" in which operation is necessary to meet the emergency. DOE cannot transform an hour-by-hour limitation into a blanket summer-season waiver, and now for more than another year, through hand-waving at "elevated risk" of tight operating reserves and "*potential* electricity shortfalls."

DOE's failure to limit dispatch to discrete periods when the generation is needed to address the purported emergency renders the Order unlawful under the plain terms of § 202(c).

*iv. The Order violates section 202(c)(2)'s environmental constraint.*

Section 202(c)(2) also requires DOE to ensure, "to the maximum extent practicable," that its orders (1) are consistent with applicable environmental laws and regulations and (2) "minimize any adverse environmental impacts." The Department makes no serious effort to comply with this mandate.

First, the Order contains no analysis of J.H. Campbell's environmental obligations. J.H. Campbell is subject to air pollution requirements limiting its emissions of $SO_2$, $NO_x$, particulate matter, and mercury, and mandates the use of pollution control equipment such as baghouses, dry sorbent injection, and activated

carbon injection systems.[296] DOE does not reference these requirements, direct Consumers to optimize the use of pollution controls or avoid operation during air quality episodes (even if those episodes occur at a time when the marginal energy from J.H. Campbell is not needed to meet electric demand), or provide any guidance for how Consumers is to operate the facility in the event that these requirements would come in conflict with its ability to provide power at any given time. It does not clarify what steps Consumers would have to take to ensure continued operation of pollution control equipment in the event such equipment malfunctioned during the 90-day period. Nor does it appear the Department consulted with the State of Michigan, including its environmental regulator, to identify mechanisms to allow J.H. Campbell to remain available in a way that would minimize conflicts with state environmental laws, which the State was uniquely positioned to advise on and which is required by section 103 of the Department of Energy Organization Act.[297]

Second, the Order does not establish any operational criteria to "minimize any adverse environmental impacts" as required by section 202(c)(2). This requirement is in addition to the direction to minimize conflicts between operations and environmental requirements. It makes clear that Congress intended DOE to go beyond just avoiding regulatory conflicts and to consider proactively the environmental impact of its emergency orders. But DOE did not design its order to minimize environmental impacts of continued operation of J.H. Campbell. In fact,

---

[296] *See* J.H. Campbell ROP, *supra* n. 290.
[297] *See* 42 U.S.C. § 7113.

DOE's order runs directly contrary to the objective of minimizing environmental impacts by expressly directing MISO to operate J.H. Campbell on an "economic dispatch" basis. That instruction prioritizes low-cost dispatch irrespective of environmental impact. The Order makes no attempt to explain how such operation ensures compliance with applicable environmental requirements to the "maximum extent feasible."

**F. The Order Violates NEPA.**

Orders issued under section 202(c) are major federal actions subject to NEPA.[298] Such orders direct federal interventions that may affect environmental conditions. The direction to continue operation of J.H. Campbell is unquestionably a major action that significantly affects the environment. Continued operation of J.H. Campbell will result in significant increases of air and water pollution compared to a scenario in which Campbell retired as planned.[299] The Campbell I Order directly conceded this point, stating "the additional generation may result in a conflict with environmental standards and requirements."[300] As discussed above, the Campbell VI Order may, too.

For any DOE action affecting the quality of the environment, DOE must comply with NEPA—including through issuance of an environmental impact

---

[298] 42 U.S.C. § 4336e(10) (defining a "major federal action" as one in which the agency carrying out such action determines subject to substantial Federal control and responsibility.").
[299] *See* J.H. Campbell ROP, *supra* n. 244; State of Michigan Department of Environmental Quality, Authorization to Discharge Under the National Pollutant Discharge Elimination System, Permit No. MI0001422 (May 29, 2018), Attachment FF, accessible through the Michigan Department of Environment, Great Lakes, and Energy's "MiEnviro Portal," https://www.michigan.gov/egle/maps-data/mienviroportal.
[300] Campbell I Order at 2.

statement, environmental assessment, categorical exclusion, or special environmental analysis.[301] DOE has not taken, or even initiated, any such action. As such, it is acting contrary to its own NEPA regulations and to its obligations under NEPA.

DOE has previously sought to comply with NEPA for section 202(c) orders through categorical exclusions or special environmental assessments. Neither have been undertaken in this instance. Moreover, neither would be applicable here.

DOE has previously pointed to categorical exclusion B4.4 for "power management activities." However, that categorical exclusion is applicable only "provided that the operations of generating projects would remain within normal operating limits." Here, the Order explicitly authorizes the J.H. Campbell plant to operate beyond its normal permitted limits. Consequently, neither categorical exclusion B4.4, nor any other available exclusion, applies.

More recently, DOE has, on certain occasions, relied on emergency provisions that can excuse agencies from preparing environmental documents before taking such actions,[302] and instead prepared after-the-fact Special Environmental Analyses in the event that an order results in a significant effect on the environment.[303]

---

[301] *See* 10 C.F.R. § 1021.102(b).
[302] *See* 10 C.F.R. § 1021.343(a); 40 C.F.R. § 1506.12.
[303] *See* DOE, Air Quality and Environmental Justice Memorandum (2021), https://www.energy.gov/sites/default/files/2022-01/sea-05-ercot-air-quality-and-ej-analysis-2021-07-21.pdf, Attachment GG; DOE, Special Environmental Analysis for Actions Taken Under U.S Department of Energy Emergency Orders Regarding Operation of the Potomac River Generating Station in Alexandria Virginia (2006), https://www.energy.gov/sites/default/files/nepapub/nepa_documents/RedDont/SEA-04-2006.pdf, Attachment HH.

However, these instances involved sudden emergencies that provided DOE substantially less notice compared to the months or years of advance warning DOE received regarding J.H Campbell's scheduled retirement. In this case, DOE acted in response to circumstances known well in advance: the long-scheduled retirement of J.H. Campbell on May 31, 2025. Given considerable lead time, DOE had ample opportunity to prepare, at a minimum, an EA prior to issuing its Order. DOE's failure to initiate any environmental review thus lacks justification.

The Campbell I Rehearing Order argued, for the first time, that preparation of a NEPA document would "clearly and fundamentally conflict with the requirements" of Section 202(c).[304] But that defense is belied by the agency's own practice of complying with NEPA in issuing 202(c) orders. Moreover, whatever "fundamental conflict" there might be in a particular case with a genuine, unexpected emergency, the Department's 90-day lead time in this case obviated any potential conflict with NEPA.

Whatever justification may have existed for sidestepping NEPA to address an emergency in the initial Order is plainly unavailable here, as DOE had months to conduct NEPA compliance while the initial Order was in place.

---

[304] Rehearing Order at ¶ 57 (quoting 42 U.S.C. § 4336(a)(3)).

## V. REQUEST FOR STAY

The Michigan Attorney General again moves DOE to stay the Order pending judicial review.[305] The factors governing DOE's decision to grant a stay point uniformly in Michigan's favor.[306]

### A. Michigan and its People Will Suffer Irreparable Injury Absent a Stay.

As a result of its continued operation, the J.H. Campbell plant is causing, and will continue to cause, increased air pollution, irreparably harming the People of Michigan. To produce electricity, J.H. Campbell combusts coal, which results in the emission of tons of SO2, NOx, and PM 2.5—all air pollutants harmful to human health. As a result of the Campbell VI Order, J.H. Campbell is continuing operations; absent the Campbell VI Order, it would be shuttered and would not emit any harmful pollutants. The generation resources that would make up for J.H. Campbell's absence, by contrast, are all but certain to be cleaner than J.H. Campbell. Accordingly, the effect of the Order is to significantly pollute Michigan's air.

The air pollution emitted by the Campbell Plant is causing, and will continue to cause, harms to public health in Michigan. According to the U.S. EPA's COBRA (CO-Benefits Risk Assessment) tool, the harms from a year of J.H. Campbell's continued operation include 27 to 36 excess deaths—8.1 to 13 in Michigan alone—as well as thousands of lost school and work days.[307] As a rough approximation, the

---

[305] 5 U.S.C. § 705; *see* 18 C.F.R. § 385.212.
[306] *See Ohio v. EPA*, 603 U.S. 279, 291 (2024); *Nken v. Holder*, 556 U.S. 418, 434, 436 (2010).
[307] Jester Affidavit, Attachment JJ, at ¶¶ 15-16. In total, the COBRA tool estimates that the total health effects are the equivalent of $420M to $700Min 2023 dollars. For Michigan alone, the COBRA model estimates effects that are the equivalent of $130M to $200M in harms. *Id.*

effects from continued use of the plant for the three-month period of the Order would be one quarter the effects of a year-long closure—i.e., increased asthma symptoms for thousands of Michigan residents, hundreds of lost school days and work days, and 2-3 Michiganders' deaths.[308] Such environmental harms, "by [their] nature, can seldom be adequately remedied by money damages." *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987).

These harms are "actual," "certain," "imminent," and "beyond remediation." *See Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015). A stay of the Campbell VI Order is necessary to prevent these harms.

**B. A Stay Would Not Harm Any Other Party**

No party would be harmed by a stay. A stay of the Campbell VI Order would not harm electricity consumers because the lack of an actual emergency means that a stay would not disrupt the provision of electricity. Nor would a stay harm Consumers, which, as noted above, is incurring millions of dollars in costs from the compelled operation of the Campbell Plant. *See supra*.

**C. A Stay Is In the Public Interest**

Because the Campbell VI Order remedies no genuine "emergency," it does not serve any public interest. Rather, the public interest would be served by a stay. *See League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (noting "there is a substantial public interest 'in having governmental agencies abide by the federal 'laws that govern their existence and operations'") (quoting *Washington v. Reno*, 35

[308] *Id.* at ¶ 19.

F.3d 1093, 1103 (6th Cir. 1994)). A stay would also serve the public interest by protecting Michigan's people (and the people of neighboring states) from the harm that increased air and water pollution from the Campbell Plant is causing and will continue to cause. Finally, a stay is in the public interest because it would prevent the Order from frustrating the settlement agreement in Michigan Public Service Commission Case (MPSC) No. U-21090, to which the Michigan Attorney General, representing the People of Michigan, was a party.

## VI. THE D.C. CIRCUIT'S DECISION IN *PEOPLE OF THE STATE OF MICHIGAN V. DOE, ET AL*

As this Request for Intervention, Rehearing, and Stay is being finalized, the United States Court of Appeals for the District of Columbia issued its decision in *People of the State of Michigan v. United States Department of Energy, et. al.,* No. 25-1159 (D.C. Cir. September 11, 2026). The Court granted the petitions for review of the first Campbell Order and vacated the Order. The Court's decision is consistent with many of the arguments set forth above regarding the Campbell VI Order and holds in pertinent part:

> Our reading of the text, structure, and history leaves us unpersuaded by DOE's sweeping conception of its "emergency" authority under section 202(c). The Department's position would empower it to pick its preferred power sources in Michigan—or, presumably, any other state—and order them to operate without regard to the multiple procedural and substantive constraints built into state reliability planning processes. We hold that section 202(c) is best read to apply where the Department identifies a risk of substantial harm from inadequate electricity supply that calls for immediate action by DOE in particular, as opposed to by the states. Because the circumstances DOE identified in the challenged order do not warrant resort to section 202(c) as correctly interpreted, we grant the petitions for review and vacate the Order.

*Id.,* slip op. at 6-7. The Michigan Attorney General, representing the People of the State of Michigan, adopts and incorporate by reference the D.C. Circuit's decision and all findings and holdings contained therein in favor of arguments of the Attorney General as briefed and as raised herein and in her prior Requests for Intervention, Rehearing, and Stay.

## VII. CONCLUSION

For the foregoing reasons, the Michigan Attorney General's request for intervention, rehearing, and stay should be granted.


Dana Nessel
Michigan Attorney General

/s/ Michael E. Moody

Michael E. Moody (P51985)
Lucas Wollenzien (P86928)
Assistant Attorneys General
Special Litigation Division
P.O. Box 30755
Lansing, MI 48909
517-335-7627
MoodyM2@michigan.gov
WollenzienL@michigan.gov

Christopher M. Bzdok (P53094)
Special Assistant Attorney General
chris@tropospherelegal.com


Dated: September 11, 2026

List of Exhibits

| Title | |
|---|---|
| Original Exhibits | |
| A | NERC 2025 Reliability Assessment |
| B | MISO Planning Resource Auction Results for Planning Year 2025-26, published April 2025, corrected and reposted May 29, 2025, Slides 18–21. |
| C | Collection of MISO Attachment Y Materials<br>- (Letter dated December 14, 2021, from Timothy J. Sparks, Consumers Energy, to Andrew Witmeier, MISO, and Attachment Y Notification of Generating Resources Change of Status).<br>- (Letter dated March 11, 2022, from Andrew Witmeier, MISO, to Timothy J. Sparks, Consumers Energy, re: Approval of Campbell Units 1, 2 & 3 Attachment Y Suspension Notice).<br>- (Email dated May 27, 2025, from Huaitao Zhang, MISO, to Kathy Wetzel, Consumers Energy).<br>- (Email dated May 28, 2025, from Rachael Moore, Consumers Energy to Huaitao Zhang, MISO).<br>- (Email dated May 30, 2025, from Marc Keyser, MISO, to Rachael Moore, Consumers Energy). |
| D | Consumers' Responses from June 10, 2025 |
| New Exhibits | |
| E | Michigan Public Service Commission (MPSC) Case No. U-21585, Direct Testimony of Richard Blumenstock, p. 7, Table 1 (5 Tr 1394-95); |
| F | MPSC Case No. U-21090 (Kapala Direct, 7 Tr 1739); |
| G | MPSC Case No. U-21090, Order approving contested settlement, June 23, 2022, p. 8. |
| H | MPSC Case No. U-21090 (Blumenstock Direct, 3 Tr 99 and 147-49), available at https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/0688y000001OEXnAAO. |
| I | MPSC Case No. U-21090-0777 (Settlement Agreement), available at https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/0688y000002gLkGAAU. |
| J | MPSC Case No. U-21775, Consumers Energy's Capacity Demonstration Filing, February 24, 2025, Ex. 2, available at: https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/068cs00000bz8crAAA |
| K | MPSC Case No. U-21775, MPSC Order, August 21, 2025, p. 19, available at: https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/068cs000016Zd18AAC. |
| L | MISO Resource Adequacy Business Practices Manual, BPM-011-r31, p. 27, Section 3.4.2 LOLE Analysis |

| | |
|---|---|
| M | MPSC Case No. U-21775, Capacity Demonstration Results Report, May 12, 2025, p. 9. |
| N | NERC Probabilistic Assessment Technical Guideline, August 2016, p. 2. |
| O | FERC Docket No. EL25-90, submission of MPSC, June 20, 2025, p. 2. |
| | |
| P | MI AG's June 18, 2025 Rehearing Request |
| Q | MI AG's July 24 DC Cir. Petition |
| R | U.S. Dep't of Energy, Resource Adequacy Report: Evaluating the Reliability and Security of the United States Electric Grid (July 7, 2025) |
| S | Motion to Intervene and Request for Rehearing by the Attorneys General of Maryland, Washington, Minnesota, Michigan, Illinois, Arizona, Colorado, Connecticut, and New York, *In re: Resource Adequacy Report: Evaluating the Reliability and Security of the United States Electric Grid, July 2025*, (the "Multistate Request for Rehearing" or "Multistate Request"). |
| | |
| T | Letter of Tina Francone to State Attorneys General (Sept. 5, 2025) |
| U | *Attributes Roadmap*, MISO (Dec. 2023), https://cdn.misoenergy.org/2023%20Attributes%20Roadmap631174.pdf. |
| V | *MISO's Response to the Reliability Imperative*, MISO (Updated Feb. 2024), https://cdn.misoenergy.org/2024+Reliability+Imperative+report+Feb.+21+Final504018.pdf |
| W | *2025 OMS-MISO Survey Results*, OMS and MISO (Updated June 6, 2025) |
| X | Consumers' June 6, 2025 FERC Complaint, Docket No. EL25-90 |
| Y | MISO, Grid Conditions Explainer |
| Z | NERC, Attachment 1-EOP-011-1 Energy Emergency Alerts. |
| AA | MISO, Load Modeling Process and Results (Apr. 24, 2025), https://cdn.misoenergy.org/20250424%20LOLEWG%20Item%2003%20Load%20Modeling%20Process%20and%20Results692675.pdf |
| | |
| BB | FERC Docket No. AD24-11-000, available at https://www.ferc.gov/media/todd-ramey-miso-senior-vice-president-markets-and-digital-strategy. |
| CC | NREL, Resource Adequacy Basics, available at https://www.nrel.gov/research/resource-adequacy. |
| DD | FERC, *Security Constrained Economic Dispatch: Definitions, Practices, Issues, and Recommendations* (July 31, 2006), https://www.ferc.gov/sites/default/files/2020-05/final-cong-rpt.pdf. |
| EE | Michigan Department of Environment, Great Lakes, and Energy, Renewable Operating Permit Issued to Consumers Energy, J.H. Campbell Generating Complex [J.H. Campbell ROP] (July 2, 2021), accessible through the Michigan Department of Environment, Great Lakes, and Energy's "MiEnviro Portal," https://www.michigan.gov/egle/maps-data/mienviroportal, and also accessible at |

| | |
|---|---|
| | https://www.egle.state.mi.us/aps/downloads/rop/pub_ntce/B2835/B2835%20FINAL%2007-01-21.pdf. |
| FF | State of Michigan Department of Environmental Quality, Authorization to Discharge Under the National Pollutant Discharge Elimination System, Permit No. MI0001422 (May 29, 2018), accessible through the Michigan Department of Environment, Great Lakes, and Energy's "MiEnviro Portal," https://www.michigan.gov/egle/maps-data/mienviroportal. |
| GG | DOE, Air Quality and Environmental Justice Memorandum (2021), https://www.energy.gov/sites/default/files/2022-01/sea-05-ercot-air-quality-and-ej-analysis-2021-07-21.pdf; |
| HH | DOE, Special Environmental Analysis for Actions Taken Under U.S Department of Energy Emergency Orders Regarding Operation of the Potomac River Generating Station in Alexandria Virginia (2006), https://www.energy.gov/sites/default/files/nepapub/nepa_documents/RedDont/SEA-04-2006.pdf |
| II | EPA's "Clean Air Markets Program Data." |
| JJ | Affidavit of Douglas Jester |
| KK | Michigan Department of Environment, Great Lakes, and Energy Air Quality Division, Supplement to Michigan's August 23, 2021, Regional Haze State Implementation Plan Revision for the Second Planning Period at 2 (March 2025), |
| LL | Modified Attachment Y Notice 2025-08-21 re: Modified Suspension Date for Campbell Units 1, 2, & 3 |
| MM | NERC 2025 Winter Reliability Assessment |
| NN | (UPDATED). Consumers 10-Q for June 30, 2026 |
| OO | NERC, 2026 Summer Reliability Assessment (May 2026) |
| PP | MISO, Planning Resource Auction, Results for Planning Year 202627 (April 2026, Slides # 14-30 updated May 22, 2026) |
| QQ | MISO, Seasonal Readiness Workshop Summer 2026 (May 6, 2026) |
| RR | NERC, 2025 LTRA Sensitivity Case Addition of ERAS Resources in the MISO Assessment Area (April 2026) |
| SS | OMS-MISO Survey Results June 4 2026 |
| TT | NERC SOR 2026 Technical Assessment |
| UU | NERC Incident Review |